LLOYD E. WILLIAMS, JR. AND MILDRED A. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Commissioner
Docket No. 36698-87
United States Tax Court
T.C. Memo 1992-269; 1992 Tax Ct. Memo LEXIS 292; 63 T.C.M. (CCH) 2959; May 11, 1992, Filed *292 Decision will be entered under Rule 155. P entered into an agreement to purchase a vacation condominium for a stated purchase price in excess of $ 1.5 million. P executed an installment note calling for two payments of the stated purchase price, the first installment due in just over 6 months and the second due in 30 years. P claims that the first installment is a payment to which sec. 483, I.R.C., applies and that unstated interest is allocated to such first installment pursuant to sec. 1.483-1(a)(1), Income Tax Regs.Held: P has failed to show that the benefits and burdens of ownership of the condominium were acquired more than 6 months prior to the due date of the first installment; accordingly, no unstated interest is allocated to the first installment pursuant to sec. 1.483-1(a)(1), Income Tax Regs.
J. Gordon Hansen, David E. Leta, and Stuart A. Fredman, for petitioners. James R. McCann and James C. Lanning, for respondent. HALPERN
HALPERN
MEMORANDUM OPINION HALPERN, Judge: By notice of deficiency dated August 21, 1987, respondent determined a deficiency in petitioners' Federal income tax in the amount of $ 29,015, for the taxable year 1983, together with an addition *293 to tax under section 6661. In an amended answer filed on September 26, 1988, respondent increased the deficiency to $ 61,011.50 and conceded that section 6661 was inapplicable. The deficiency at issue derives from respondent's disallowance of a deduction for unstated interest claimed by petitioner Lloyd E. Williams, Jr., in connection with his purchase of a one-half interest in a Utah condominium unit. We focus here on whether the sale to him of the one-half interest in the condominium occurred in June 1983. Petitioners claim that it did, such that the interest component of an installment payment of the purchase price made on December 30, 1983, is computed pursuant to section 1.483-1(a)(1), Income Tax Regs.
Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Background
At the time the petition in this case was filed, petitioners Lloyd E. Williams, Jr., and Mildred *294 A. Williams resided in Kenilworth, Illinois. Hereinafter, the term "petitioner", when used in the singular, will refer to petitioner Lloyd E. Williams, Jr. Purchase Agreement
The Pinnacle at Deer Valley (The Pinnacle) is a condominium project located in Deer Valley, Park City, Utah. Deer Valley contains a ski resort. RDG Associates, a Utah limited partnership, is the developer of The Pinnacle and, during all times here relevant, marketed condominium units in The Pinnacle. [1] On June 22, 1983, petitioner, a lawyer, and C. Barry Montgomery, one of petitioner's law partners (together, Buyers), entered into a condominium purchase agreement (the Purchase Agreement) with RDG Associates (Seller) to purchase a condominium unit in The Pinnacle. *295 Among other terms, the Purchase Agreement provides that the Buyers are purchasing, and the Seller is selling, Unit 37, a residential condominium, in The Pinnacle (the Condominium). The stated purchase price is $ 1,514,000. The Purchase Agreement requires the Buyers immediately to pay $ 10,000, as a downpayment, with the balance of the purchase price, or $ 1,504,000, to be paid in installments, in accordance with the terms of a promissory note (the Installment Note), to be described. The Purchase Agreement requires certain documents to be placed in escrow, to be delivered by the escrow agent (Escrow Agent) on December 30, 1983, the "Settlement Date" (Settlement Date). The Seller was to place in escrow a warranty deed conveying to the Buyers title to the Condominium (Warranty Deed). The Buyers were to place in escrow a deed of trust, along with a rider to the deed (together, Second Deed of Trust), and a quitclaim deed reconveying the Condominium from the Buyers to the Seller (Quitclaim Deed). The Warranty Deed, Second Deed of Trust, and Quitclaim Deed were executed by the appropriate persons on June 23, 1983, and placed in escrow. The Purchase Agreement states further that the *296 Buyers entered into possession of the Condominium as of June 22, 1983, and that the parties would enter into a Memorandum of Condominium Purchase Agreement (Memorandum of Purchase Agreement). The Memorandum of Purchase Agreement is described as "evidencing Buyer's purchase of, and equitable title to, the Condominium". The memorandum was executed on June 23, 1983, and recorded on June 27, 1983. Upon recordation of the Memorandum of Purchase Agreement, the Seller was obligated to deliver to the Buyers a commitment to issue a title insurance policy. The Purchase Agreement provides that real estate taxes are to be prorated as of June 22, 1983, to reflect that the benefits and burdens of ownership have transferred to the Buyers. Further, the Buyers have no right to assign or transfer the Purchase Agreement or their rights under that agreement without the Seller's prior written consent. The Purchase Agreement requires the Condominium to be completed and equipped according to certain specifications reviewed by the Buyers, but it grants the Seller the right to make certain changes provided that such changes do not materially diminish the Condominium's value. The Purchase Agreement *297 obligates the Seller to use reasonable efforts to have the Condominium fully constructed and ready for occupancy by December 30, 1983, and requires the Seller to complete the Condominium, and the entire building of which the Condominium is a part, within 200 or fewer days, or by early January 1984. On June 23, 1983, the Buyers paid the sum of $ 10,659.72 to the Seller, which sum included the downpayment ($ 10,000), an estimated proration of taxes ($ 259.72), and a homeowner's capitalization fee ($ 400). Petitioner paid one-half of that sum. On June 23, 1983, the residential unit of the Condominium had not yet been constructed. On that date, excavation for the building containing the residential unit had been completed and a few supports and beams had been placed. The residential unit was not completed until after January 1, 1984. Installment Note and Judgment Note
The Installment Note, dated June 23, 1983, has a stated face amount of $ 1,504,000. It calls for two payments. The first payment (first installment), in the amount of $ 477,000, is due on the Settlement Date, December 30, 1983, and the second payment (second installment), in the amount of $ 1,027,000, is due *298 on July 24, 2013. The Installment Note states: "No interest shall be charged on the face amount owed hereunder during the term thereof." To secure partially their obligation to make the first installment (due on the Settlement Date), the Buyers executed contemporaneously with the Installment Note a judgment note, in the amount of $ 50,000 (Judgment Note). Upon payment of the first installment, the Seller was to return the Judgment Note to the Buyers. The Installment Note contemplates that the Buyers might finance the first installment ($ 477,000). It provides that the obligation to pay the second installment on July 24, 2013, would be subordinate to such financing. Default Prior To Settlement Date
The Purchase Agreement provides the Seller with two remedies in the event of a default by the Buyers prior to the Settlement Date (Pre-Settlement Default): (i) Seller may be released from all obligations in law and equity to convey fee simple title to the [Condominium] and Buyer shall become at once a tenant at will of Seller. Upon written notification from Seller, Escrow Agent shall record the Quit-Claim Deed from Buyer to Seller deposited with Escrow Agent herewith, and *299 all payments which have been made previously under this agreement by Buyer, together with the Judgment Note, shall be retained by Seller as liquidated and agreed damages for breach of this Agreement, and Seller shall be entitled in connection therewith to make demand for payment of the proceeds of the Judgment Note; or (ii) Seller may, upon written notice to Buyer, declare the entire amount under the Installment Note at once due and payable and may elect to treat this Agreement as a note and mortgage, and tender title to Buyer subject thereto, and proceed immediately to foreclose the same in accordance with the laws of the State of Utah, and have the * * * [Condominium] sold and the proceeds applied to the payment of the balance owing, and Seller's costs and attorneys' fees; provided, however, that Seller's sole remedy in such an event shall be to foreclose Buyer's rights under this Agreement, and Buyer shall not be liable for any deficiency between the amounts owed under the Installment Note and the proceeds from such foreclosure. [Emphasis added.] The Purchase Agreement provided the Buyers with one remedy in the event of the Seller's default prior to Settlement Date: In the *300 event Seller defaults under this Agreement prior to the Settlement Date, Buyer's sole and exclusive remedy shall be to terminate and rescind this Agreement, whereupon Seller shall return to Buyer all sums previously paid by Buyer to Seller hereunder and any prior reservation agreement, together with interest thereon at the rate of six percent (6%) per annum, and Seller shall cancel and return to Buyer the Judgment Note, the [Installment] Note, and the Trust Deed [i.e., Second Deed of Trust]. Upon such termination, Escrow Agent shall record with the Summit County, Utah, Recorder the Quit-Claim Deed to the Condominium deposited with Escrow Agent herewith, and Seller and Buyer shall have no further obligations to each under this Agreement or any other agreement with respect to this transaction. Side Agreement
The Seller and the Buyers signed a letter dated June 23, 1983, containing handwritten revisions and additions that modified the terms of the transaction. Later, that letter was retyped, and a few other revisions and additions were made. The retyped letter, dated September 15, 1983, was then executed by the parties. We shall refer to those two letters collectively as *301 the "Side Agreement". Under the Side Agreement, the Seller could not sell the Installment Note for 5 years and could not exercise any right to demand payment of the second installment under the Installment Note prior to July 24, 2013. The Side Agreement further provided that the Seller was willing to sell the Installment Note back to the Buyers at a present-value price (determined by a 10-percent semiannual compounding of interest). Also, the Side Agreement obligated the Seller to deliver to the Buyers a commitment from a financial institution to finance the first installment. Under the Side Agreement, if the Condominium was not ready for occupancy by December 31, 1983, the Seller was obligated to lease the Condominium from the Buyers until its completion, at a rent equal to the interest incurred on the Buyers' financing of the first installment. In turn, the Buyers agreed that the Seller would not be deemed in default under the Purchase Agreement unless the Condominium were not completed by March 15, 1984. Co-Ownership Agreement
On August 1, 1983, the Buyers executed a co-ownership agreement (the Co-Ownership Agreement): "to memorialize their agreement that each will *302 be liable to the other to pay one-half of the purchase price and any debts incurred by them in the course of paying the purchase price". The Co-Ownership Agreement provided that each Buyer owned an undivided one-half interest in the Condominium as a tenant-in-common and in any income earned with respect to the Condominium. Under the Co-Ownership Agreement, each Buyer granted the other a lien on the other's interest in the Condominium to secure repayment of any excess payments with respect to the Condominium's ownership and operation. The lien was subject to foreclosure if a Buyer failed to reimburse the other Buyer for an excess payment within 60 days following demand by the other Buyer for reimbursement. Buyers' Financing of the First Installment Payment
The Buyers obtained partial financing from Columbia Savings and Loan Association, Irvine, California (Lender), for payment of a portion of the first installment. Before financing the Buyers' payment of the first installment, the Lender obtained an appraisal of the Condominium. The appraisal report estimated that, as of November 11, 1983, the Condominium's market value was $ 500,000, with a range of $ 471,500 to $ 538,500. *303 On December 15, 1983, the Buyers borrowed $ 400,000 from the Lender and executed a Balloon Payment Fixed Rate Note payable to Lender, with a face amount of $ 400,000 (Fixed Rate Note), and with joint and several liability. The Fixed Rate Note was secured by a Deed of Trust, with the Lender as the beneficiary (First Deed of Trust). Settlement Date
On the Settlement Date, the Buyers paid to the Seller the first installment of $ 477,000. The Escrow Agent returned to the Buyers the Quitclaim Deed and delivered to the Buyers, and recorded in the appropriate land records, the Warranty Deed and the Second Deed of Trust. In turn, pursuant to the Purchase Agreement, the Seller returned to the Buyers the Judgment Note and delivered to the Buyers an owner's title insurance policy insuring the Buyers' title to the Condominium. The title insurance policy was issued by the Escrow Agent in the amount of $ 519,200. Buyers' Default After Settlement Date
The Purchase Agreement provides that, if the Buyers default after the Settlement Date either in the payment of any amounts owing under the Installment Note or in performing any obligation under the Second Deed of Trust (Post-Settlement *304 Default), the Seller may exercise any and all remedies in the Installment Note or the Second Deed of Trust. The Installment Note provides that, in the event of a Post-Settlement Default, the Seller may declare to be immediately due and payable all amounts under the Installment Note. Consistent with the Installment Note, the Second Deed of Trust provides that, upon a Post-Settlement Default, the Seller "may execute or cause * * * [the trustee under the Second Deed of Trust] to execute a written notice of default and of election to cause * * * [the Condominium] to be sold to satisfy the obligations hereof, and * * * [said trustee] shall file such notice for record in each county" in which the Condominium is located. The Second Deed of Trust also provides that, in the event of a default, the Seller could "declare all sums secured hereby immediately due and payable and foreclose this Trust Deed in the manner provided by law for the foreclosure of mortgages on real property." Petitioners' 1983 Federal Income Tax Return
On their 1983 tax return, petitioners claimed an interest deduction in the amount of $ 145,075 arising in part from the Buyers' payment in December 1983 of the *305 first installment of $ 477,000. [2]
Procedural History
By notice of deficiency dated August 21, 1987, respondent determined a deficiency for the taxable year 1983 in petitioners' Federal income tax in the amount of $ 29,015, together with an addition to tax under section 6661. The sole adjustment giving rise to the deficiency at issue is respondent's disallowance of the interest expense of $ 145,075, computed by petitioners pursuant to section 1.483-1(a), Income *306 Tax Regs., and claimed by petitioners on account of their payment of the first installment. In an amended answer filed on September 26, 1988, respondent increased the deficiency to $ 61,011.50, but conceded that petitioners were entitled to deduct $ 630 as interest paid to the Lender during 1983 and that section 6661 was inapplicable. In March 1990, this Court issued an opinion in response to the parties' cross-motions for partial summary judgment. Williams v. Commissioner, 94 T.C. 464 (1990). In that opinion, this Court focused on whether section 446(b) or 461(g) limited petitioners' interest deduction to the amount of interest that economically accrued rather than to the amount of interest determined under section 483. We held that neither section so limited petitioners' deduction. Id. at 472. Because involving factual disputes and, thus, inappropriate for summary judgment, we did not address certain other issues raised by respondent. Id. at 472-473. Later, in August 1990, respondent filed a motion for leave to file a second amendment to answer. We granted that motion, and respondent's second amendment to answer *307 was filed. That amendment raised formally two additional issues: whether section 189 or 163 limits the amount of interest deductible by petitioners. Since that amendment, however, respondent has conceded that section 163(d) is not applicable. Discussion
Are We Precluded From Considering Section 483's Applicability?
At trial, we asked the parties to address in their briefs the question of whether our opinion in Williams v. Commissioner, 94 T.C. 464 (1990) (Williams I), precludes us from considering whether the provisions of section 483 govern the first installment. Petitioners argue that, as a result of Williams I, the doctrines of res judicata and the law of the case prevent us from considering the applicability of section 483. Respondent disagrees, arguing that the issue of the applicability of section 483 was not considered in Williams I. We agree with respondent. In Williams I, we considered the parties' cross-motions for partial summary judgment, filed under Rule 121. We specifically noted that unresolved issues of fact precluded final resolution of the case. 94 T.C. at 465. We treated the parties' motions as motions for *308 partial summary judgment on what we styled "the section 483 issue". That issue was whether either section 446(b) or 461(g) limits petitioners' interest deduction to the amount of interest that economically accrued rather than to the amount of interest determined by section 483. 94 T.C. at 465, 467, 472. Sections 446(b) and 461(g) were two of the grounds cited by respondent in her notice of deficiency as grounds for the disallowance of petitioners' interest deduction. In Williams I, we concluded that neither section 446(b) nor section 461(g) limits petitioners' interest deduction to the amount of interest that economically accrued. 94 T.C. at 472. We granted petitioners' cross-motion for partial summary judgment that neither such section so limits petitioners' interest deduction and denied respondent's motion for partial summary judgment. Petitioners' res judicata argument has no merit. Res judicata is a common-law doctrine that serves to promote judicial economy and the repose of disputes. Gustafson v. Commissioner, 97 T.C. 85, 91 (1991). In Commissioner v. Sunnen, 333 U.S. 591, 597 (1948), the Supreme *309 Court explained res judicata as follows: The general rule of res judicata applies to repetitious suits involving the same cause of action. * * * The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. [Citations omitted.] The application of res judicata requires a final judgment. Gustafson v. Commissioner, supra, at 91-92; Shaheen v. Commissioner, 62 T.C. 359, 363-364 (1974). In the cause of action before us, however, we have only granted petitioners' cross-motion for partial summary judgment that neither section 446(b) nor section 461(g) limits the interest deduction at issue to the amount that economically accrued. *310 See Williams I, 94 T.C. at 472. We have issued no final judgment here. Sec. 7481(a). See Russell v. Commissioner, 678 F.2d 782, 786 (9th Cir. 1982). Each tax year is the origin of a new income tax liability and a separate cause of action. Commissioner v. Sunnen, supra at 598; Johnson v. Commissioner, 1 T.C. 1041, 1050 (1943). We have yet to redetermine petitioners' income tax liability for the tax year at issue and have issued no final judgment regarding that liability. Further, petitioners' law-of-the-case argument is also not successful. See 1B Moore, Moore's Federal Practice, par. 0.404[1], [4.-1] at 117, 124 (2d ed. 1991). Although in Williams I we styled the issues that we were dealing with as the "section 483 issue," our description of the section 483 issue clearly shows that we were, in essence, dealing only with certain technical issues that, had respondent prevailed, would have foreclosed any further inquiry into the application of section 483 to the first installment. Those technical issues concerned whether section 446(b) or 461(g) limits the interest deduction at issue to the amount *311 that economically accrued, rather than to the amount of interest determined under section 483. Our opinion in Williams I is too narrowly focused to be generalized into a plenary rejection of any further argument by respondent concerning the requirements of section 483 under the doctrine of law of the case. Finally, on brief, petitioners also argue that they have been caught by surprise by respondent's claim that the first installment is not a payment for which unstated interest is determined under section 483. Petitioners fault respondent for failing to have pled that issue. Petitioners may somewhat misunderstand the workings of this Court. Our job is to redetermine deficiencies determined by respondent. See sec. 6214(a). Respondent's notice of deficiency is not a pleading. See Rule 30. Respondent's notice is sufficient if (1) it fairly advises the taxpayer that respondent has in fact determined a deficiency and (2) specifies the year and amount. Stevenson v. Commissioner, T.C. Memo. 1982-16. Nevertheless, we understand petitioners' objection to be that respondent did not raise the section 483 issue either in her notice of a deficiency or in her answer, *312 and thus we ought to consider respondent's present stance as a surprise to petitioners. See, e.g., Riss v. Commissioner, 57 T.C. 469, 470-474 (1971), affd. Commissioner v. Transport Manufacturing and Equipment Co., 478 F.2d 731, 734-736 (8th Cir. 1973). We think that petitioners' own pleadings belie their arguments that the section 483 issue was not raised in respondent's notice of deficiency and that they are surprised by respondent's present stance and have no fair warning of such stance. The notice of deficiency makes only one adjustment to petitioners' return and describes in part that adjustment as: "Item Changed: -Schedule E Rental, Condo Pinnacle, Expense, IRC § 483-$ 145,075." In her notice, respondent further describes that adjustment, as follows: "Full disallowance of interest expense of IRC § 483 for violating provisions of IRC § 461(g), for not clearly reflecting income under Sec. 446, and for lacking economic substance and reality as cited by the courts as being required by the Code." In their petition, petitioners did not restrict their assignment of errors, and statement of facts in support of those errors, to the three particular *313 reasons described in the above quoted explanation. In full, paragraph 4 of the petition provides as follows: The determination of tax set forth in the said notice of deficiency is based upon the following errors: a. The Commissioner erred in disallowing as interest expense the sum of $ 145,075, which sum was deducted pursuant to I.R.C. section 483 on the petitioner's 1983 income tax return. b. The Commissioner erred in alleging the petitioner violated the provisions of I.R.C. section 461(g). c. The Commissioner erred in alleging the petitioners income was not clearly reflected as required by I.R.C. section 446. d. The Commissioner erred in alleging that the transaction which gave rise to the disallowed deduction lacked economic substance and reality. As facts in support of the first assignment of error, petitioners continue for over three pages, explaining in detail the transaction in question. After quoting a portion of section 483(c)(1) (describing payments to which section 483 applies), petitioners add: "Therefore, the total of all payments to which section 483 applies is $ 1,504,000, comprised of the first installment of $ 477,000 which was due December *314 30, 1987[3], and the second installment of $ 1,027,000 which is due 30 years from the date of the purchase agreement." In her answer, respondent denied that she erred, as alleged by petitioners in paragraph 4(a)-(d) of the petition. We think that whether or not respondent's notice raises adequately the issue of section 483, beyond the particulars set out in her explanation (and we are not saying that it does not), petitioners responded in their petition as if respondent's notice did so adequately raise, and as if they had fair warning of, the issue of section 483's applicability. See Pagel, Inc. v. Commissioner, 91 T.C. 200, 210-213 (1988); William Bryen Co. v. Commissioner, 89 T.C. 689, 704-709 (1987). Thus, we dismiss petitioners' claim of surprise as unfounded. Questions Presented
Having disposed of what might be termed preliminary, procedural matters, we now turn to the substantive aspects of this case. Respondent presents nine questions to be answered, which can be distilled into three assertions: 1. The first installment is due 6 months or less after the date of sale or exchange of the condominium. 2. The transaction *315 was a tax avoidance scheme devoid of economic substance. 3. Because construction period interest must be amortized, petitioners' interest deduction is limited. Since we agree with the first assertion, we need not reach either of the second two, and respondent's determination must be sustained. We will begin our analysis by exploring in some detail the workings of section 483. Section 483
Section 483(a) states that in certain designated transactions: for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract. Section 1.483-1(d), Income Tax Regs., provides tests to determine whether unstated interest exists. Under provisions applicable to the period at issue, the test rate is 9-percent per annum simple interest. Sec. 1.483-1(d)(1)(ii)(C), Income Tax Regs. Failing that test, the imputed interest rate is 10-percent per annum compounded semiannually. Sec. 1.483-1(c)(2)(ii)(C), Income Tax Regs.
*316 After the imputed interest is determined, it is allocated to the principal payments of the debt on a pro rata basis. Sec. 483(a). Section 1.483-1(a)(1), Income Tax Regs., provides: Thus, the amount to be treated as interest under section 483 is determined by multiplying each payment to which such section applies by a fraction, the numerator of which is the total unstated interest under the contract, and the denominator of which is the total of all payments to which section 483 applies * * *. The effect of this ratio is to allocate the total unstated interest on a pro rata basis among the total payments to which section 483 applies. Section 483 and the relevant regulations provide specific rules for the deduction of imputed interest by a buyer under the cash and accrual methods of accounting. Any allocable amount treated as unstated interest under section 483 by a cash method purchaser would be deductible as interest in the taxable year in which the payment is made. Accrual method taxpayers must claim the unstated interest deduction in the taxable year in which the payment becomes due. [3]Sec. 1.483-2(a)(1)(ii), Income Tax Regs.
*317 Section 483(a) states that it applies "for purposes of this title" (i.e., the entire Internal Revenue Code), and section 1.483-2(a)(1), Income Tax Regs., provides that amounts treated as unstated interest under section 483 shall be treated as interest "for all purposes of the Code." Pursuant to section 483(c), section 483 applies only to payments for the sale or exchange of property due more than 6 months after the date of such sale or exchange under a contract both containing unstated interest and calling for payments to be made more than 1 year after the date of such sale or exchange. Section 1.483-1(b)(1), Income Tax Regs., provides that: "The term 'sale or exchange' includes any transaction treated as a sale or exchange for purposes of the Code." Respondent argues that the sale of the Condominium occurred after June 1983, so that the first installment, due on the Settlement Date (December 30, 1983), was due less, not more, than 6 months after the sale. Petitioners' position is to the contrary. We agree with respondent that a sale of the Condominium did not occur prior to the end of June 1983. Therefore, the first installment is not a payment to which section 483 applies. *318 Sec. 483(c). Accordingly, no portion of the first installment can be treated as unstated interest under section 483(a). Benefits and Burdens of Ownership
The term "sale" is not used in any unusual sense in section 483. See sec. 1.483-1(b)(1), Income Tax Regs. For Federal income tax purposes, the term "sale" normally is given its ordinary meaning and generally is defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-571 (1965); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). We do not doubt that, at some point, the Buyers purchased the Condominium. The question is when. When a sale is complete for tax purposes is essentially a question of fact to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances, no single one of which is controlling. Paccar, Inc. v. Commissioner, 85 T.C. 754, 777 (1985); Derr v. Commissioner, 77 T.C. 708, 724 (1981). The applicable test is a practical one. Derr v. Commissioner, supra at 724; *319 Baird v. Commissioner, 68 T.C. 115, 124 (1977). The economic substance of a transaction, rather than its form, governs for Federal tax purposes. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Grodt & McKay Realty, Inc. v. Commissioner, supra at 1236. In examining the circumstances surrounding a conveyance of property to determine when it occurred, the focus is on when the "benefits and burdens" of ownership shifted to the buyer. Paccar, Inc. v. Commissioner, supra at 777; Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237. Consequently, we consider whether the Buyers acquired the benefits and burdens of ownership of the Condominium in June 1983. Baird v. Commissioner, supra at 124-125. Petitioners bear the burden of proving that they did. Rule 142(a). In Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238, we noted some of the factors that courts have considered in determining when a sale occurs. Those factors are as follows: (1) Whether legal title passes; (2) how the parties treat the transaction; *320 (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [Citations omitted.] We consider those factors that are relevant in light of petitioner's situation. -- Legal Title
A warranty deed in favor of the Buyers was executed on June 23, 1983. Nevertheless, the Buyers did not receive legal title to the Condominium in June 1983, as the Warranty Deed was placed in escrow at that time. While passage of legal title is not the determinative factor in deciding when ownership has passed, it is certainly an important consideration. Harmston v. Commissioner, 61 T.C. 216, 228-229 (1973). Legal title to the Condominium did not transfer to the Buyers until the Escrow Agent delivered the Warranty Deed to them on the Settlement Date. See Roberts v. Osburn, 589 P.2d 985, 989 (Kan. Ct. App. 1979); *321 28 Am. Jur. 2d, Escrow, sec. 10 (1966).[4] Under Utah law, the Buyers obtained at best some equitable, not legal, interest in the property at the time the Purchase Agreement was executed; recordation of the Memorandum of Purchase Agreement had no effect on the passage of legal title. Bekins Bar V Ranch v. Beryl Baptist Church, 642 P.2d 371, 373 (Utah 1982); Estate of Willson v. State Tax Commission, 499 P.2d 1298, 1300 (Utah 1972); Lach v. Deseret Bank, 746 P.2d 802, 805 (Utah Ct. App. 1987). -- Equity in the Condominium
In the absence of legal title, the acquisition of an *322 equity interest in property generally signifies ownership for tax purposes. See Haggard v. Commissioner, 241 F.2d 288, 289 (9th Cir. 1956); Oesterreich v. Commissioner, 226 F.2d 798, 803 (9th Cir. 1955). Petitioners have failed to carry their burden of showing that the Buyers, in June 1983, acquired any equity in the Condominium. In June 1983, the Buyers paid $ 10,659.72 to the Seller. Pursuant to the Purchase Agreement, however, that amount was refundable, with interest at 6 percent, if the Seller defaulted prior to the Settlement Date. Also, upon default of the Seller prior to the Settlement Date, the Judgment Note would be canceled and returned to the Buyers, as would be the Installment Note and the Second Deed of Trust. The meager penalty (restitution plus the payment of apparently below-market-rate interest) is inconsistent with any practical obligation on the part of the Seller and, in substance, supports the conclusion that the Seller had no more than an option to sell the Condominium, which it, of course, might decline to exercise. [5] Thus, until the Seller were to choose to exercise its option, the Buyers had no definite risk *323 of loss associated with nonpayment of the Installment Note. Similarly, until then, the Buyers had no definite opportunity to benefit from their approximately $ 10,000 investment. Until the Settlement Date, that investment was, at best, only a potential equity in the Condominium, which would ripen into an actual equity interest only if the Seller were to exercise its option, and if, at that time, it made economic sense for the Buyers not to default. [6] Thus, as of June 1983, the Buyers' equity interest in the Condominium could not be ascertained. Petitioners have failed to show that, as of then, the Buyers had acquired an equity interest in the Condominium. *324 -- Present Obligations
In June 1983, neither the Buyers nor the Seller had any unconditional obligations under the Purchase Agreement. See Major Realty Corp v. Commissioner, 749 F.2d 1483, 1486-1487 (11th Cir. 1985), affg. in part and revg. in part T.C. Memo. 1981-361. The Purchase Agreement was in the nature of an executory contract, as each party had several substantive obligations to fulfill before the sale was complete. See Westrom v. Commissioner, T.C. Memo. 1966-198. Under the Purchase Agreement, while the Seller was obligated to perform several tasks prior to Settlement Date, the Buyers had one very limited remedy in the event the Seller defaulted prior to Settlement Date. The Buyers' sole and exclusive remedy under the Purchase Agreement was to terminate the Purchase Agreement and to receive back from the Seller all sums previously paid by the Buyers, together with interest at 6 percent per annum. Any ownership interest that the Buyers had would, by Quitclaim Deed, be transferred back to the Seller. As we have described previously, the Seller had, in essence, the option, but not the obligation, to complete *325 the sale of the Condominium to the Buyers. Further, under the Side Agreement, the Seller was obligated to deliver to the Buyers, prior to Settlement Date, a commitment from a financial institution to finance the Buyers' payment of the first installment. That provision of the Side Agreement appears to be a condition of sale, such that the Buyers' obligation was not fixed or unconditional in June 1983. In sum, petitioners have failed to carry their burden of showing that, in June 1983, the parties to the Purchase Agreement had unconditional present obligations to fulfill. -- Right to Possession
The Purchase Agreement provides that the Buyers entered into possession of the Condominium as of June 1983. Petitioners have not, however, met their burden of producing evidence that would support that conclusion. Possession of real property serves to place all persons on constructive notice of the rights of the possessor and serves to charge all such persons with the duty to inquire as to the rights of the possessor. 77 Am. Jur. 2d, Vendor and Purchaser, sec. 671 (1975). Such possession must be actual, open, definite, and unambiguous. Holmgren Brothers, Inc. v. Ballard, 534 P.2d 611, 614 (Utah 1975); *326 77 Am. Jur. 2d, Vendor and Purchaser, sec. 675 (1975). No deed had been delivered to the Buyers in June 1983. The recordation of a deed to them as grantees would have signified their possession. The Buyers have not shown that they were otherwise in possession in June. They were not in physical possession of the Condominium in the sense that they were living (or could live) in the residence that the Seller was to construct.[7] In June, only the excavation work and the placement of a few beams had been completed. Petitioners argue that the Buyers may have had some equitable interest in the Condominium under the doctrine of equitable conversion. See, e.g., Estate of Willson v. State Tax Commission, 499 P.2d 1298, 1300 (Utah 1972). That may be so. Nevertheless, such equitable interest does not necessarily imply possession. See 77 Am. Jur. 2d, Vendor and Purchaser, secs. 371 and 352 (1975). Petitioners have not shown that they were in possession in June 1983. *327 -- Payment of Property Taxes
Although the Purchase Agreement required the real estate taxes to be prorated as of June 1983, and although the Seller and the Buyers apparently did prorate those taxes as of that date, we do not give great weight to that fact. The real estate taxes for the second half of 1983 were only slightly more than $ 200, and that amount is insignificant in comparison to the Condominium's purchase price of $ 1,514,000 (respondent's view) or roughly $ 520,000 (petitioners' view). -- Profits from Operation or Sale of Property
In June 1983, petitioner was in no position to receive the profits from the operation of the Condominium. As we have stated, petitioner's interest in, and the benefits of ownership of, the Condominium derived at least in part from its potential rental value, and the Condominium was not completed until 1984. The Side Agreement required the Seller to pay rent to the Buyers if the Seller failed to complete the Condominium on time. The obligation to pay rent to the Buyers, however, arose only if the Condominium was not ready for occupancy by December 31, 1983. Further, petitioner lacked in June 1983 an unrestricted right to sell *328 the Condominium because, under the Purchase Agreement, the Buyers could not assign or transfer, voluntarily or involuntarily, the Purchase Agreement or their rights under that agreement without the Seller's prior written consent. We thus conclude that the Buyers did not own the Condominium in June 1983 in the sense that, realistically, they could profit from its operation or sale. Conclusion
We find that, in June 1983, the Seller did not transfer to the Buyers the benefits and burdens of ownership of the Condominium and that any sale of the Condominium occurred thereafter. Accordingly, the first installment, due on December 30, 1983, was due less than 6 months after the date of such sale. The first installment is not a payment to which section 483 applies, and section 1.483-1(a)(1), Income Tax Regs., does not apply to determine the interest component of the first installment. To reflect concessions made by respondent Decision will be entered under Rule 155.
Footnotes
1. Pursuant to Utah law, the term "condominium unit" includes a unit (here a residence) together with an undivided interest in the common areas and facilities appertaining to that unit. Utah Code Ann. sec. 57-8-3(6) (1990). Each unit, together with its undivided interest in the common areas and facilities, constitutes real property under Utah law. Utah Code Ann. sec. 57-8-4↩ (1990).
2. A schedule attached to petitioners' tax return calculates the interest component of that first installment paid by Buyers pursuant to sec. 483, as follows: PRESENT VALUE
INTEREST
PAYMENT
% INTEREST
DOWN
$  10,000
$        $    10,000
FIRST PAY.
454,285
22,715
477,000
4.762%
SECOND PAY.
54,986
972,014
1,027,000
94.646%
TOTAL
$ 519,271
$ 994,729
$ 1,514,000
66.1389%
1983 INTEREST $ 477,000 x 66.138907% = 315,483
FIRST MORTGAGE INTEREST 630
CONST. PERIOD INTEREST $ 519,271 x 5.00% = (25,964)     NET DEDUCTION $ 290,149
[Petitioner's share of the net deduction is one-half, or $ 145,075.]↩
3. An opinion from Arthur Andersen & Company purporting to describe the tax consequences of the transaction in question illustrates those consequences as follows: Hypothetical Illustration of Imputed Interest under IRC Sec. 483
Assume a cash basis taxpayer enters into the proposed transaction. On the date the agreement is executed a $ 10,000 down payment and $ 100,000 irrevocable standby letter of credit are received by RDG. Further assume that a $ 450,000 noninterest-bearing cash payment is made 186 days after the date the agreement is executed and a second noninterest-bearing payment of $ 1,000,000 is made 30 years after the agreement is executed. The following illustrates the interest deductions pursuant to Reg. Sec. 1.483-1(c)(3): Total payments to which IRC Sec. 483
applies
$ 1,450,000
Less: Present value of $ 450,000
due in 186 days.
Reg. Sec. 1.483-1(g).
($ 450,000 x .95238)
$ 428,571
Present value of $ 1,000,000
due in 30 years. Reg. Sec.
1.483-1(g) ($ 1,000,000 x
.05354)
53,540
482,111
Total Unstated Interest
$   967,889
The total unstated interest, as illustrated above, is allocated pro rata to each installment. Consequently, a cash basis buyer would deduct $ 300,379 ((450,000 divided by 1,450,000) x 967,889) of interest in the year the first installment is paid and $ 667,510 ((1,000,000 divided by 1,450,000) x 967,889) in the year the second installment is paid.↩
4. We note that, while the Warranty Deed was recorded on Dec. 30, 1983, recordation of the Warranty Deed is not relevant for determining when the Seller transferred legal title to the Buyers. Recording laws are designed to provide third parties with notice of real property interests. Bekins Bar V Ranch v. Beryl Baptist Church, 642 P.2d 371, 373↩ (Utah 1982).
5. The Seller would have an economic incentive not to exercise that option if another buyer were willing to pay more than the Buyers had agreed to pay. ↩
6. It would make economic sense for the Buyers to default if their potential net loss on any resale of the Condominium exceeded the sum of the amount they already had paid plus the amount of the Judgment Note.↩
7. Respondent has not suggested that a portion of the consideration the Seller received from the Buyers pursuant to the Purchase Agreement was for the construction of improvements on property owned by the Buyers and not for the purchase of property. Since respondent has not raised that point, we will accept, without deciding, that the Purchase Agreement was not to any extent a contract for services.↩