Marian **BENEDICT, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 93–C–957B.**

United States District Court,
D. Utah,
Central Division.

April 4, 1995.

J. Gordon Hansen, Scott R. Carpenter, Kent O. Roche, Parsons, Behle & Latimer, Salt Lake City, UT, for plaintiffs.

Scott M. Matheson, Jr., Salt Lake City, UT, for defendant.

## OPINION AND ORDER

BENSON, District Judge.

### I. Introduction

This tax case came on for a bench trial in the United States District Court for the District of Utah before the Honorable Dee Benson on September 7, 1994. J. Gordon Han-

sen appeared on behalf of plaintiff taxpayers. Kirk C. Lusty appeared on behalf of the United States.

The parties stipulated to the facts, offered into evidence joint exhibits, presented written and oral legal arguments, and submitted the case to the Court for decision. The Court took the matter under advisement.

Now being fully apprised, and for good cause appearing, the Court hereby enters the following Opinion and Order.

## II. Stipulated Facts [1]

1. Plaintiff Marian Benedict resides at 340 Hager Lane, Glenview, Illinois 60025, and her taxpayer identification number is 356–20–0634. Plaintiff Robert J. Benedict resides at 2130 Common Riding Way, Inverness, Illinois 60067, and his taxpayer identification number is 341–44–9607. Plaintiff William J. Finn, Jr. resides at 2628 South Des Plaines Avenue, North Riverside, Illinois 60545, and his taxpayer identification number is 319–24–5149. Plaintiff Charles C. Fitzmorris resides at 111 East Wacker Drive, Suite 1620, Chicago, Illinois 60601–4503, and his taxpayer identification number is 322–10–0558. Plaintiff Michael J. Flood resides at 126 Winding Way, Stirling, New Jersey 07980, and his taxpayer identification number is 151–26–2798. Plaintiff Jeffrey A. Hackney resides at 680 Chippewa, Naperville, Illinois 60563–1368, and his taxpayer identification number is 343–42–6455. Plaintiff Gerald F. Hartley resides at 19 Lake Ridge Club Court, Burr Ridge, Illinois 60521–7936, and his taxpayer identification number is 310–40–3603. Plaintiff Paul A. Jones resides at 1803 Wagner Road, Glenview, Illinois 60137, and his taxpayer identification number is 322–05–8209. Plaintiff Frank P. LaFranco, M.D. resides at 1661 Everett, Lake Forest, Illinois 60015, and his taxpayer identification number is 327–38–5922. Plaintiff Charles B. McKenna resides at 25 W. 575 Picadilly Road, Wheaton, Illinois 60187, and his taxpayer identification number is 385–48–3012. Plaintiff Michael H. Mohr resides at 1103 Troust Avenue, Forest Park, Illinois 60130, and his taxpayer identification number is 341–42–0164. Plaintiff Midcorp, Inc.'s principal place of business is 2215 York Road, Oak Brook, Illinois 60521, and its employer identification number is 36–3394495. Plaintiff William C. Nickels resides at 1102 North Park Avenue, River Forest, Illinois 60305, and his taxpayer identification number is 349–18–7011. Plaintiff Louis F. Pignatelli resides at 614 Louis Lane, Rock Falls, Illinois 61071, and his taxpayer identification number is 357–36–5066. The foregoing parties will be referred to herein collectively as the "Plaintiffs" and singularly as a "Plaintiff."

2. Hilltop West 44, Hilltop West 70, Hilltop West 71, Hilltop West 72 and Hilltop West 78 (collectively, the "Partnerships") are general partnerships which were formed in December of 1983.

3. Hilltop West 44's employer identification number is 36–3310177, Hilltop West 70's employer identification number is 36–3310225, Hilltop West 71's employer identification number is 36–3310226, Hilltop West 72's employer identification number is 36–3310227, and Hilltop West 78's employer identification number is 36–3310238.

4. The principal place of business of each of the Partnerships at the time of the filing of this action was in Park City, Utah.

5. Each of the Partnerships was formed to purchase one condominium located in the Pinnacle at Deer Valley, a condominium project located in Park City, Utah, from RDG Associates ("RDG"). The five condominiums acquired by the Partnerships will be referred to hereinafter as the "Condominiums."

6. Each of the Partnerships executed virtually identical condominium purchase agreements dated December 26, 1983 (the "Purchase Agreements") to acquire the Condominiums. At that time a few of the Pinnacle Condominiums had been completed, several were under construction, and the infrastructure for the Pinnacle condominium project was virtually complete. However, physical

---

1. These facts are taken from the Stipulated Record dated June 20, 1994 (docket no. 14), with minor corrections to reflect subsequent events and communications with counsel for both sides.

(See ¶ 24 (adjusting date to reflect proper tax year in question); ¶ 37 (excluding reference and footnote discussing possible jurisdictional question as to two plaintiffs).)

construction of the five Condominiums that are the subject of the Purchase Agreements in this case had not yet begun as of the date of the Purchase Agreements. The material terms of each of the Purchase Agreements are the same, and differ only with respect to the identity of the respective buyer and the stated purchase price. A representative copy of a Purchase Agreement is submitted in this case as Joint Exhibit 1–A. The purchase prices set forth in the Purchase Agreements are as follows:

| Partnership | Stated Purchase Price |
| --- | --- |
| Hilltop West 44 | $1,668,650 |
| Hilltop West 70 | $1,687,495 |
| Hilltop West 71 | $1,679,418 |
| Hilltop West 72 | $1,687,495 |
| Hilltop West 78 | $1,698,264 |

7. Upon the execution of the Purchase Agreements, each Partnership made a $10,000 cash payment toward the purchase price of its Condominium and delivered virtually identical recourse promissory notes ("Promissory Notes") for the balance of the stated purchase price. The Promissory Notes differed only with respect to the identity of the maker and the amount of the first installment payment. A representative copy of a Promissory Note is submitted in this case as Joint Exhibit 2–B.

8. Each of the Promissory Notes required one payment on December 27, 1985, with the balance of the purchase price due on December 26, 2013. The amounts of the first and second installments under each of the Promissory Notes are as follows:

| Partnership | First Installment | Final Installment |
| --- | --- | --- |
| Hilltop West 44 | $556,650 | $1,102,000 |
| Hilltop West 70 | $575,495 | $1,102,000 |
| Hilltop West 71 | $567,418 | $1,102,000 |
| Hilltop West 72 | $575,495 | $1,102,000 |
| Hilltop West 78 | $586,264 | $1,102,000 |

9. Each of the Promissory Notes states that no interest will be charged on its unpaid balance.

10. Upon the execution of the Purchase Agreements, and in accordance with their terms, each of the Partnerships and RDG delivered several other executed documents to Western States Title Company ("Western"), as escrow agent, to hold until the first installments under the Promissory Notes were paid. These documents included the following:

(a) A $50,000 judgment note for each Condominium in favor of RDG (the "Judgment Notes"), each of which provided that it could be enforced by RDG if the maker defaulted on its obligation to pay the first installment under its Promissory Note. Each of the Judgment Notes was essentially identical, and differed only with respect to the identity of the maker. A representative copy of a Judgment Note is submitted in this case as Joint Exhibit 3–C;

(b) A deed of trust that encumbered each Condominium, securing the payment obligations represented by the Promissory Note (the "Deeds of Trust"). Each of the Deeds of Trust was virtually identical, and differed only with respect to the identity of the trustor and the description of the Condominium. A representative copy of a Deed of Trust is submitted in this case as Joint Exhibit 4–D;

(c) A special warranty deed for each Condominium (the "Warranty Deeds"). Each of the Warranty Deeds is nearly identical, and differed only with respect to the identity of the grantee and the description of the Condominium. A representative copy of a Warranty Deed is submitted in this case as Joint Exhibit 5–E;

(d) A quit-claim deed for each Condominium (the "Quit–Claim Deeds"). Western was instructed to record the appropriate Quit–Claim Deed if a Partnership defaulted on its obligation to pay the first installment under its Promissory Note. The Quit–Claim Deeds are virtually identical, and differed only in the identity of the grantor and the description of the Condominium. A representative copy of a Quit–Claim Deed is submitted in this case as Joint Exhibit 6–F; and

(e) A memorandum of Purchase Agreement for each Condominium (the "Memoranda"), memorializing the parties' agreement regarding the purchase terms of the Condominiums. The Memoranda are nearly identical and differ only in their descriptions of the buyer and the property. A representative copy of a Memorandum is submitted in this case as Joint Exhibit 7–G.

The Judgment Notes, Warranty Deeds, Quit–Claim Deeds, Deeds of Trust and Mem-

oranda will be collectively referred to hereafter as the "Condominium Documents."

11. Each of the Purchase Agreements states that all of the benefits and burdens of ownership of the Condominiums transferred to the respective purchasing Partnership on the date of the Purchase Agreements.

12. The terms of the escrows are identical and are included as part of the Purchase Agreements. There is no provision whereby a seller of a condominium may obtain documents that were placed in escrow unless there is a default by the buyer.

13. In accordance with the terms of the Purchase Agreements, on or about December 30, 1983, Western recorded the Memoranda with the Summit County, Utah, Recorder. On August 28, 1984, each Partnership's interest in the Condominiums was subordinated to the First National Bank of Chicago in order to enable RDG to acquire construction financing. A copy of a representative "Subordination Agreement" is submitted in this case as Exhibit 18–R.

14. Under the terms of the Purchase Agreements, upon each Partnership's payment of the first installments under its Promissory Note, Western was to record the Warranty Deed and Trust Deed, return the Quit–Claim Deed and Judgment Note to the Partnership, deliver a title insurance policy on the Condominium to the Partnerships and close the escrow accounts (the "Settlement").

15. According to the Park City Planning and Building Department, physical construction of the Condominium buildings did not commence until July 3, 1984. The Purchase Agreement provided that RDG "shall use reasonable efforts to have the Condominium fully constructed and ready for occupancy by March 15, 1985." The appraised value for each of the unfurnished Condominiums upon completion was approximately $530,000.

16. Prior to the due date of the first installment under the Promissory. Notes, Plaintiffs and others formed Pinnacle Partners, Ltd., an Illinois limited partnership ("Pinnacle Partners"), for the purpose of acquiring by way of capital contribution a 98% managing general partnership interest in each of the Partnerships. A copy of the agreement of limited partnership for Pinnacle Partners is submitted in this case as Joint Exhibit 8–H. Submitted as Joint Exhibits 9–I and 10–J, respectively, are copies of the private offering memorandum (the "Offering Memorandum") that was delivered to prospective limited partners in Pinnacle Partners, and the subscription documents (including counterpart signature pages) for the Plaintiffs other than Midcorp, Inc., Pinnacle Partners' general partner.

17. Pinnacle Partners thereafter acquired an option (the "Option") to acquire the 98% general partner interests in the Partnerships, which it exercised prior to the Partnerships' payment of the first installments under the Promissory Notes. Copies of the Option and the letter exercising it are submitted in this case as Joint Exhibits 11–K and 12–L, respectively.

18. Prior to the payment of the first installments under the Promissory Notes, each of the Partnerships admitted Pinnacle Partners as a general partner. The stated reason for admitting Pinnacle Partners into each of the Partnerships was a determination that the Partnerships "require[d] additional capital to make the payments required to purchase and pay for such [Condominium] unit[s]." Copies of the amended and restated partnership agreements for each of the Partnerships reflecting the admission of Pinnacle Partners as a partner are submitted in this case as Joint Exhibit 13–M.

19. Each of the Partnerships elected an interim closing of its books for the purpose of allocating items of Partnership income and loss among all of its partners in accordance with the partners' varying interests.

20. In connection with the admission of Pinnacle Partners as a partner in each of the Partnerships, the limited partners of Pinnacle Partners executed Assumption Agreements, pursuant to which they unconditionally assumed and agreed to pay their pro rata shares of the second installments under the Promissory Notes. A representative copy of the Assumption Agreements is submitted in this case as Joint Exhibit 14–N.

21. Each of the Partnerships timely made the first installment payment that was due

under the terms of its Promissory Note, and Western delivered, recorded and returned the Condominium Documents in accordance with the terms of the Purchase Agreements, and as described above in paragraph 14. Copies of settlement statements reflecting the amounts paid by and credited to the parties at Settlement are submitted in this case as Joint Exhibit 15–O.

22. Approximately $460,000 of each first installment payment was financed by a loan from Columbia Savings and Loan Association to each of the Partnerships, which was evidenced by standard loan documentation.

23. Each of the Partnerships timely filed its partnership tax return for the year ending December 31, 1985, with the service center for the Internal Revenue Service located in Ogden, Utah, in accordance with the accrual method of accounting.

24. In preparing their tax returns for 1985, the Partnerships computed the amount of total unstated interest attributable to the Promissory Notes in accordance with the provisions of § 483 of the Internal Revenue Code (the "Code"), as in effect in December of 1985.

25. On June 1, 1993, the Defendant, by and through the Internal Revenue Service, mailed to Ronald Ferrin, the President of Midcorp, Inc., the "tax matters partner" of each of the Partnerships, a Notice of Final Partnership Administrative Adjustment (the "Notices"), as described in § 6223(a)(2) of the Code. Copies of each of the Notices are submitted in this case as Joint Exhibit 16–P.

26. The Notices adjusted each of the Partnerships' 1985 partnership tax returns by disallowing interest expense claimed by the Partnerships in the following amounts:

| Partnership | Interest Expense Disallowed |
| --- | --- |
| Hilltop West 44 | $359,332 |
| Hilltop West 70 | $368,205 |
| Hilltop West 71 | $364,420 |
| Hilltop West 72 | $368,205 |
| Hilltop West 78 | $373,221 |

27. The disallowance of interest expense was based on a determination by the Internal Revenue Service that the purchases of the Condominiums by the Partnerships did not occur more than 6 months prior to the pay-ment of the first installments under the Promissory Notes.

28. The Notices also adjusted each of the Partnerships' 1985 partnership tax returns by disallowing deductions for real estate taxes in the following amounts:

| Partnership | Real Estate Taxes Disallowed |
| --- | --- |
| Hilltop West 44 | $1,919 |
| Hilltop West 70 | $1,965 |
| Hilltop West 71 | $1,965 |
| Hilltop West 72 | $1,964 |
| Hilltop West 78 | $3,107 |

29. The disallowance of the real estate tax deductions was based on a determination by the Internal Revenue Service that the purchase of the Condominiums did not take place as claimed on the Partnerships' tax returns.

30. The Notices also adjusted each of the Partnership's 1985 partnership tax returns by disallowing the amortization of construction period interest and taxes in the following amounts:

| Partnership | Construction Period Interest and Taxes Disallowed |
| --- | --- |
| Hilltop West 44 | $2,525 |
| Hilltop West 70 | $2,608 |
| Hilltop West 71 | $2,575 |
| Hilltop West 72 | $2,609 |
| Hilltop West 78 | $2,769 |

31. The disallowance of amortized construction period interest was based on a determination by the Internal Revenue Service that such amortizations were based on the improper calculation of interest expenses under § 483 of the Code.

32. The Internal Revenue Service did not assert any penalties in the Notices.

33. The "tax matters partner" of each of the Partnerships is Midcorp, Inc., whose address is 2215 York Road, Oak Brook, Illinois.

34. Midcorp, Inc. failed to file a Petition for Readjustment of Partnership Items within the period specified in § 6226(a) of the Code.

35. The Plaintiffs, who are partners of Pinnacle Partners, timely filed this action in their capacities as "indirect notice partners" of the Partnerships under the provisions of § 6226(b) of the Code.

36. Each of the Plaintiffs has an interest in the outcome of this proceeding because the partnership items of the Plaintiffs for the periods in question have not become non-partnership items, and because the periods in which tax attributable to those partnership items may be assessed had not yet expired.

37. All Plaintiffs have satisfied the requirements of § 6226(e)(1) of the Code by making the required good-faith deposits with the Internal Revenue Service of their respective portions of the additional tax liabilities set forth in the Notices, or have not made any deposit with the Internal Revenue Service because they would have no tax liability for the period ending December 31, 1985, even if the adjustments in the partnership tax returns were upheld. Copies of the checks tendered by the Plaintiffs to the Internal Revenue Service with respect to those deposit requirements and the cover letter to the Internal Revenue Service accompanying those deposits are submitted in this case as Joint Exhibit 17–Q.

38. John E. Gorman, Chief Executive Officer of the general partner of RDG, instructed counsel to insert the clause in the Purchase Agreements that provides for $60,000 of liquidated damages (i.e., the $10,000 earnest money payment and $50,000 Judgment Note) in the event of a default by a condominium purchaser after the closing date of the purchase of its respective Condominium on December 26, 1983, but prior to the settlement date in December 1985 because he had been advised by such counsel that applicable Utah real estate law would limit the damages RDG could recover upon a default, and that such damages would not be likely to exceed $60,000.

39. The individual Plaintiffs anticipated that income from the rental of the Condominiums would furnish funds to offset a portion of their operating cash deficits, but they did not anticipate that the ownership by the Partnerships of the Condominiums or the operation of Pinnacle Partners would be profitable on a pre-tax basis.

40. The Offering Memorandum states that the Partnerships' expected capitalization would generate substantial cash shortfalls, and that the success of Pinnacle Partners depended upon the appreciation in value of the Condominiums and the Partnerships' ability to refinance or effect a bulk sale of the Condominiums. The Offering Memorandum further states that if the Condominiums were not sold or refinanced, the Partnerships would be forced to abandon the Condominiums or obtain further funds from the partners of Pinnacle Partners or the other partners of the Partnerships.

41. Defendant agrees that the Partnership's purchases of the Condominiums were not sham transactions, although Defendant does not agree that the purchase of the Condominiums occurred in December of 1983.

42. In the event of any discrepancy between the actual terms of the documents referred to in this stipulation and the terms described herein, the actual documents shall control over these stipulations.

43. The parties have no objection to the admission of Joint Exhibits A–1 through 18–R, and urge the Court to admit the same into evidence.

### III. Question Presented

■ The question presented by the stipulated facts is when the sale of the property occurred. The parties agree this is a question of fact.[2] If the sale occurred when the partnerships signed the purchase agreements in December 1983, then the December 1985 installment was due more than six months after the date of such sale, and plaintiffs are entitled to the deductions they claimed pursuant to § 483 of the Code. If, on the other hand, the sale occurred on the settlement date in December 1985, then the December 1985 installment was not due more than 6 months after the date of such sale, and plaintiffs are not entitled to the deductions they claimed pursuant to § 483.

2. Although plaintiffs couched their briefs in summary judgment terms, the question left for the Court to determine is one of fact, not one of law.

The Court therefore sits as trier of fact and may properly assess the weight of the evidence and draw reasonable inferences therefrom.

### IV. Arguments of The Parties

#### A. The Williams Litigation

Both sides recognize that this very question has been squarely presented and addressed in another circuit. In *Williams v. Commissioner*, 63 T.C.M. (CCH) 2959, 1992 WL 95656 (1992), *aff'd*, 1 F.3d 502 (7th Cir. 1993), the Tax Court and the Seventh Circuit Court of Appeals considered the precise question under similar facts dealing with the same development and developer in Park City, Utah. Although differing in their analyses, both courts held that the sale occurred at the time of settlement, and the deductions were therefore disallowed.

A second case, *Lang v. Commissioner*, 66 T.C.M. (CCH) 1027, 1993 WL 406428 (1993), addressed the same question. The Tax Court found in *Lang* that because appeal lay in the Seventh Circuit, the court was bound to follow *Williams* in disallowing the deductions.

This Court, of course, is not bound by the *Williams* decision, as appeal in this case lies in the Tenth Circuit. However, the effect of the *Williams* opinions and their respective analyses factors heavily into the parties' positions in the instant case. The reasoning of those courts will therefore be closely examined.

#### B. Plaintiffs' Arguments

Plaintiffs suggest that a federal standard determines when the sale occurs. That standard, they say, focuses on when the buyers assumed the benefits and burdens of property ownership. *See, e.g., Estate of Johnston v. Commissioner*, 51 T.C. 290, 1968 WL 1446 (1968), *aff'd*, 430 F.2d 1019 (6th Cir.1970). Plaintiffs submit Utah law determines when those benefits and burdens actually transferred. In the instant case, plaintiffs argue, they transferred when the partnerships entered into the purchase agreements. Plaintiffs contend that the intent of the contracting parties, as demonstrated through the documents and through their respective actions, confirms this fact.

Plaintiffs also argue the doctrine of equitable conversion vested equitable title in the partnerships upon execution of the purchase agreements. At that point, they say, the partnerships' interest became one in realty while the seller's became one in personal property. *See, e.g., Butler v. Wilkinson*, 740 P.2d 1244 (Utah 1987). That fact, plaintiffs argue, further supports a finding that the partnerships acquired the benefits and burdens of ownership in December 1983.

Plaintiffs also cite Tax Court decisions and argue they met substantially all the tests of ownership under those decisions in December 1983. *See Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–38, 1981 WL 11305 (1981) (and cases cited therein); *Gefen v. Commissioner*, 87 T.C. 1471, 1492, 1986 WL 22070 (1986); *see also* Richard E. Marsh, Jr., *Tax Ownership of Real Estate*, 39 Tax Law. 563 (1981) (attached as Appendix 1 to plaintiffs' opening memorandum, docket no. 16) (analyzing property ownership for tax purposes).

Plaintiffs argue that the *Williams* decisions were simply wrong and that this Court should not view them as binding precedent. Plaintiffs challenge *Williams* on each element, first in their opening brief and again in their reply memorandum. Plaintiffs urge the Court not to accord the *Williams* opinions any deference but to decide in plaintiffs' favor based on established principles of Utah law.

#### C. Defendant's Arguments

Defendant agrees that a sale occurs when the benefits and burdens of ownership have transferred to the buyer. Defendant argues, however, that such incidents of ownership transferred in this case on the settlement date, not the signing date. Defendant argues that by studying the substance of the transaction rather than its mere form, the facts show the sale did not truly occur until December 1985.

Defendant bases the bulk of its opening brief on the *Williams* decisions, arguing that the outcome in those cases was correct and urging the court to follow their holdings. Defendant's reply brief is limited to distinguishing plaintiffs' citations and refuting plaintiffs' conclusions.

## V. Discussion

### A. The Williams Decisions

To appreciate the parties' arguments in this case, a review of what the *Williams* courts did is imperative.

In *Williams v. Commissioner*, 63 T.C.M. (CCH) 2959, 1992 WL 95656 (1992), the Tax Court found that "[w]hen a sale is complete for tax purposes is essentially a question of fact to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances, no single one of which is controlling." *Id.* at 2965 (citing *Paccar Inc. v. Commissioner*, 85 T.C. 754, 777, 1985 WL 15411 (1985); *Derr v. Commissioner*, 77 T.C. 708, 724, 1981 WL 11300 (1981)). The court focused its inquiry on "when the 'benefits and burdens' of ownership shifted to the buyer." *Id.* The court determined that the buyers bore the burden of proving when that shift took place. *Id.*

In making its determination, the court examined "some of the factors that courts have considered in determining when a sale occurs." *Id.* Those factors are:

"(1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property."

*Id.* at 2965–66 (quoting *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–38, 1981 WL 11305 (1981)). The Tax Court then proceeded to examine each of "those factors that [were] relevant in light of petitioner's situation." *Id.* at 2966.

*1. Legal Title:* The court noted buyers did not receive legal title when they signed the purchase agreements. *Id.* The court found that, "[u]nder Utah law, the Buyers obtained at best some equitable, not legal, interest in the property at the time the Purchase Agreement was executed." *Id.*

*2. Equity:* The court noted the down payment was refundable if the seller defaulted prior to the settlement date. That "meager penalty"—"restitution plus the payment of apparently below-market-rate interest" (6%)—showed the seller had no real obligation to sell the condominium. *Id.* The court determined this arrangement amounted to no more than an "option to sell." *Id.* Because the seller could decline to exercise that "option," buyers' down payment was at best only a "potential equity." *Id.* The court concluded buyers therefore had failed to carry their burden of showing any equity in the property. *Id.*

*3. Present Obligations:* The court determined that neither buyers nor seller had any unconditional obligations under the relevant contract. "The Purchase Agreement was in the nature of an executory contract, as each party had several substantive obligations to fulfill before the sale was complete." *Id.* The court reiterated that seller's obligation was at best an option. *Id.* The court also found that, under a side agreement between the seller and buyers, a condition precedent to the sale existed in the contract: buyers were first obligated to obtain a commitment from a financial institution to finance the first installment. *Id.* at 2967. The court determined buyers had failed to carry their burden to show the contracting parties had "unconditional present obligations to fulfill." *Id.*

*4. Right to Possession:* The court found buyers had not entered into physical possession because the condominium was not yet built. *Id.* Furthermore, no deed had been recorded that might have signified possession. *Id.* Finally, any equitable interest buyers might have had did not necessarily imply possession. *Id.* The court therefore found plaintiffs had failed to carry their burden on the possession issue.

*5. Payment of Property Taxes:* Buyers were required by the purchase agreement to pay property taxes, but the amount paid—a little over $200—was negligible in the court's view and not worthy of significant weight vis-a-vis the purchase price. *Id.*

*6. Profits:* The court found the benefits of owning the condominium "derived at least in part from its potential rental value." *Id.* Because the condominium was not complete at the time of the purchase agreement, buyers could not realize any profits. *Id.* Furthermore, buyers were restricted by the purchase agreement from transferring their contract rights prior to the settlement date without seller's approval, further negating any profits they might derive from the property. *Id.*

The court concluded that the buyers had failed to show they received the benefits and burdens of ownership at the time they signed the contract. *Id.* The court accordingly found the sale took place upon settlement. *Id.*

The Seventh Circuit reviewed the court's factual determination under the usual "clearly erroneous" standard. *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir.1993). The appeals court "assume[d] that section 483 simply attaches federal tax consequences to a transaction defined by state law." *Id.* The court then analyzed the transaction under Utah law.

The court first rejected buyers' argument that the contract vested them with equitable title. *Id.* at 505–06. Judge Posner reasoned that buyers' "exclusive remedy" under the contract was rescission, thereby excluding the equitable remedy of specific performance, a feature incident to the holding of equitable title. *Id.* The court disagreed with plaintiffs that such a conclusion would render sellers' obligations illusory, reasoning that illusion does not necessarily follow from unenforceability. *Id.* at 506.

Next, Judge Posner determined that even if the court were to imply specific performance in the contract, the contract would be nothing more than a "buyer's option": buyer paid $10,000 down and put up a $50,000 judgment note for the option to purchase the property. *Id.* The court concluded the "buyer's option" description of the contract was more accurate than the Tax Court's "seller's option" theory. The court reasoned that the seller did not truly have an option whether to complete the settlement: under the terms of the purchase agreement, seller could not touch the documents in escrow unless buyers defaulted on their first installment. *Id.*

The court found the buyers' rescission provision would be necessary, however, in case seller breached the contract by not completing the condominium units as required. *Id.* at 506–07. If seller did breach in that way, buyers could do nothing more than rescind and recover their money. *Id.* at 507. The court reasoned the buyers would not have been willing to pay a first installment on a condominium not yet completed. *Id.* at 507.

In effect, the court concluded, seller sold buyers a purchase option—a "call"—for $60,000. *Id.* Unfortunately for plaintiffs, however, "[t]he sale of a call for $60,00 is not the sale of a house for $500,000." *Id.* The court recognized that as the amount paid by a buyer creeps toward the purchase price, courts become more inclined to find a property sale rather than an option sale. *Id.* (citing *Commissioner v. Baertschi,* 412 F.2d 494 (6th Cir.1969) (down payment of 29% evidenced sale of property); *Commissioner v. Stuart,* 300 F.2d 872, 875 (3d Cir.1962) (down payment of 10% evidenced sale of purchase option)). However, where the plaintiffs had put down only 12% of the purchase price, the Tax Court did not clearly err in declining to find a sale. *Id.*

In sum, the Seventh Circuit affirmed the decision of the Tax Court.

## B. Analysis of the Instant Case

■ " ' "[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." ' " *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985) (quoting *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960) (quoting *Morgan v. Commissioner,* 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 585 (1940))). "This follows from the fact that the federal statute 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.' " *Id.* (quot-

ing *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958)).

■ The parties agree this case turns on when the benefits and burdens of ownership passed to the partnerships. Both parties, following the outline in the *Williams* Tax Court decision, have focused on the factors set forth in *Grodt & McKay Realty, Inc.,* 77 T.C. at 1237–38. This Court's analysis will focus on those same factors.[3]

### 1. Legal Title

■ It is undisputed that legal title did not pass at the time the partnerships signed the purchase agreements. Plaintiffs attempt to minimize the impact of that fact, arguing that the rights associated with title substantially passed because RDG deposited the warranty deeds into escrow and because ownership of the property equitably converted to the partnerships once the purchase agreements were signed. Defendant argues that while passage of legal title is not determinative of when a sale takes place, it is an important factor that is missing in this case.

Plaintiffs cannot count this factor in their favor. Even if plaintiffs were correct in asserting that ownership of the property equitably converted to them at the time the partnerships signed the purchase agreements, that fact does not satisfy the legal title inquiry.

At the same time, however, the passage of legal title is not truly an important factor in the instant case, and certainly not dispositive of the issue before the Court. In this as in

other areas of the law, a legal formality plays second string to a substantive reality. *See, e.g., Baird v. Commissioner,* 68 T.C. 115, 1977 WL 3656 (1977) (holding sale of Utah real estate occurred for tax purposes despite fact that legal title had not yet passed); *see also Dettmers v. Commissioner,* 430 F.2d at 1023 (sale occurs for tax purposes at earlier of transfer of legal title or transfer of benefits and burdens of ownership); *cf.* U.C.C. § 9–202 (title to collateral immaterial in determining rights, obligations, and remedies under article 9). As defendant has succinctly argued, this Court must look to the substance of the transaction in making its determination. Thus, while legal title did not pass until December 1985, that fact is irrelevant if the benefits and burdens passed at an earlier date.

### 2. Intent of the Parties to the Transaction

*Grodt & McKay Realty* listed "how the parties treat the transaction" as one of the factors to consider, but neither of the *Williams* courts considered it. The Tax Court apparently did not view it as "relevant in light of petitioner's situation," 63 T.C.M. (CCH) at 2966, although it had earlier held that the date the benefits and burdens passed was "to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances." *Id.* at 2965.[4]

■ The intent of the parties generally controls the meaning of any contract. *See,*

---

**3.** The federal courts have applied various standards to determine when a sale occurs for tax purposes. *See* Richard E. Marsh, Jr., *Tax Ownership of Real Estate,* 39 Tax Law. 563, 566–67 (1981). The parties to the instant dispute have essentially agreed, however, that the timing of the sale must be determined by reference to when the "benefits and burdens" of ownership passed from the seller to the buyers. The parties also agree that substance must prevail over form—i.e., the Court must objectively determine when such benefits and burdens *actually* passed.

Relying on a federal tax case for the factors to consider in making this determination does not impinge on the controlling effect of state law. Each of the relevant factors described in *Grodt & McKay Realty* must be established by resort to Utah law. *Cf. Major Realty Corp. v. Commissioner,* 749 F.2d 1483, 1486 n. 1 (11th Cir.1985)

(correctly describing the interplay of federal and state law in this context).

**4.** The factor under consideration might be confused with or otherwise appear to subsume the overall aim of the *Grodt & McKay Realty* factors, which is to determine based on the relevant documents and actions when the benefits and burdens passed. However, in reviewing "how the parties treat the transaction," the focus is on the parties' *subjective* intent. In contrast, the overall aim of the factors test is to determine objectively when the benefits and burdens of ownership passed, i.e., to determine the *objective* substantive effect of the contracting parties' actions. The subjective intent of the parties is one factor that helps inform that ultimate question.

*e.g., Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991) ("In interpreting a contract, the intentions of the parties are controlling."). The intent of the contracting parties in the instant case carries significant weight, as the other factors in the analysis depend for their outcome, in part, on what the parties accomplished through their written purchase agreements.[5] Furthermore, the government has stipulated that "the Partnership's purchases of the condominiums were not sham transactions." (Stipulated Facts ¶ 41.) Thus, the language of the documents and the parties' related actions present a solid basis for determining the contracting parties' real intent regarding the purchase and sale of the condominiums.[6]

Even the most cursory examination of the relevant documents in evidence suggests the contracting parties intended the sale to occur in 1983. The first document submitted is the representative December 1983 contract, titled "Condominium Purchase Agreement" between RDG and the partnership, denominated respectively as "Seller" and "Buyer." (*See* Joint Exh. 1-A.) The first paragraph reads: "Buyer hereby purchases and Seller hereby sells ... a residential condominium...." (*Id.* ¶ 1.) Paragraph 6 states that "all of the benefits and burdens of ownership of the Condominium have been transferred to Buyer as of the date hereof, subject to the terms and conditions hereof." (*Id.* ¶ 6). Other language within the purchase agreements consistently evidences the same intent. (*See, e.g., id.* ¶ 5 ("Buyer accepts the Condominium...."); ¶ 6 ("Seller and Buyer shall enter into a Memorandum of Condominium Purchase Agreement evidencing Buyer's purchase of ... the Condominium....")). The purchase agreement is an unambiguous expression by the contracting parties that the benefits and burdens of ownership were to pass to the buyer on December 26, 1983. *Cf. Baird v. Commissioner,* 68 T.C. 115, 1977 WL 3656 (1977) (parties intended benefits and burdens of ownership to pass under document titled "Preliminary Agreement" in which the parties stated that "BUYER agrees to buy ... and the SELLER agrees to sell said properties....").

Other documents and related actions of the seller and buyers further confirm this finding. The partnerships' respective partnership agreements read: "The Partnership was formed to acquire, own, maintain, and rent to others condominium Unit No. [___], ... in the Pinnacle at Deer Valley, a condominium development in Park City, Utah (the 'Property'). In furtherance of its business, *the Partnership purchased the Property on December 26, 1983.*" (Joint Exh. 13-M, at 1, art. II (emphasis added)). The partnerships' Option Agreement with Pinnacle Partners—dated November 15, 1985—recites in the first paragraph that "[t]he Hilltop partnerships each separately own a condominium unit at The Pinnacle At Deer Valley...." (Joint Exh. 11-K, at 1.)[7]

These documents evidence an understanding that the incidents of ownership passed to the partnerships in December 1983. They further evidence the partnerships acted in

---

**5.** *But see* Marsh, *supra* note 3, at 574, 577 (subjective intent of contracting parties should carry little or no weight in analysis).

**6.** In the absence of a sham deal, the partnerships had a right to structure their transactions so as to minimize their tax liability. *See, e.g., Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir.1934) (L. Hand, J.) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."), *aff'd,* 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). *But cf. Marsh, supra* note 3, at 574 (intent of parties to transaction suspect because of incentive to minimize tax liability).

**7.** In addition, the Pinnacle Partners' limited partnership agreement, agreed to before the settlement date, states that the partnerships "have purchased a Pinnacle condominium from RDG Associates." (Joint Exh. 8-H, ¶ 1.1.12.) Likewise, the Pinnacle Partners' offering memorandum, dated November 1, 1985, states that Pinnacle Partners, Ltd., "recently was formed to acquire ... a 98% general partnership interest in up to 10 general partnerships, each of which owns a condominium unit located in Park City, Utah." (Joint Exh. 9-I, at 1.) The document further explains that "[t]he Hilltop Partnerships originally purchased the Condominiums in December 1983 from RDG Associates." (*Id.* at 2.)

conformity with that position. The language cited is unambiguous.

In addition, four days after signing the purchase agreements, the contracting parties had their escrow agent record a Memorandum of Purchase Agreement. (*See* Joint Exh. 7–G.) The pertinent language of that document reads: "Seller has agreed to sell and Buyer has agreed to purchase that certain real property ... located in Summit County, Utah...." (*Id.* ¶ A.) This language is slightly ambiguous: it may be read to state that the parties had already consummated a purchase and sale or to state that the parties had merely agreed to consummate such a purchase and sale at some future time. The supposed ambiguity melts away, however, in light of the contemporaneous clarification that the parties recorded the Memorandum to "evidenc[e] Buyer's purchase of ... the Condominium." (Condominium Purchase Agreement, Joint Exh. 1–A, ¶ 6).

In sum, the intent of the parties to the transaction as evidenced by the language of the purchase agreement and other documents, and by the actions of the parties thereto, shows the contracting parties intended the sale to take place in 1983. Plaintiffs have proven this factor by a preponderance of the evidence.

### 3. Equity in the Condominiums

■ The facts show that each of the partnerships' down payments was a payment toward the ultimate purchase price of the various condominiums. (*See* Condominium Purchase Agreement, Joint Exh. 1–A, ¶ 2; Stipulated Facts ¶ 7 ("Upon execution of the Purchase Agreements, the Partnerships each made a $10,000 cash payment toward the purchase price of its Condominium....").) That money went directly to the seller, not into escrow with the judgment note and other documents. (*See* Purchase Agreement, Joint Exh. 1–A, ¶ 9 ("[A]ll sums paid by Buyer under this Agreement will be paid to Seller...."); *cf. id.* ¶ 2 (describing items to be held in escrow).) Under usual circumstances, the partnerships would be said to have acquired an immediate equity in the property.

Nevertheless the government argues, and the *Williams* trial court reasoned, that the down payment did not give buyers equity in the property because the $10,000 was subject to forfeiture in case of buyers' default. *See* 63 T.C.M. (CCH) at 2966. That reasoning relies, in turn, on the characterization of the purchase agreement as an option contract, with the $10,000 down payment operating as part of the option price. *See id.;* 1 F.3d at 506–07.

■ State law must determine the nature of the contract in question. Under Utah law, "an option contract for real property requires one offer and acceptance of the exclusive right to purchase the property and another offer and acceptance for the actual transfer of the property." *Property Assistance Corp. v. Roberts*, 768 P.2d 976, 978 (Utah Ct.App. 1989). In *Roberts*, the court found a real estate contract not to be an option arrangement where a single written document "integrate[d] all the essential negotiations between the 'buyer' and the 'seller,'" and where "[n]o 'second contract' for the purchase of the property was necessary," despite the fact the form contract at issue was couched in option terms. *Id.* The court determined the language of the agreement, the behavior of the parties, and the surrounding circumstances evidenced something more than a mere option. *Id.* at 979; *see also Winegar v. Froerer Corp.*, 813 P.2d at 108 (parties' intent controls interpretation of contract).

The written contract in the instant dispute, like the *Roberts* contract, contained all the essential negotiations between the buyers and seller. Moreover, the condominium purchase agreement was couched in terms of purchase and sale, not in terms of an option as in *Roberts*. The intent of the parties as evidenced by the language of the document, the behavior of the contracting parties, and the surrounding circumstances all point to a purchase and sale arrangement in December 1983.[8]

When the partnerships wanted to negotiate an option, they knew how to do it. (*See*

---

**8.** *See supra* part V.B.2 (finding parties intended

sale under written contract in December 1983).

Option Agreement, Joint Exh. 11–K ("The Hilltop partnerships hereby grant Pinnacle an option to purchase a Hilltop Partnership Interest....."); *see also* Notice of Exercise of Option, Joint Exh. 12–L ("Please be advised that Pinnacle Partners, Ltd., an Illinois limited partnership, hereby exercises its option to acquire a 98 percent general partnership interest ... pursuant to that certain Option Agreement dated November 15, 1985.").) Joint Exhibits 11–K and 12–L faithfully illustrate the simple steps described by the *Roberts* court to grant and exercise an option. On the other hand, when the partnerships wanted to negotiate a purchase and sale, they also knew how to do it. (*See* Condominium Purchase Agreement, Joint Exh. 1–A ("Buyer hereby purchases and Seller hereby sells....").) In the absence of an option arrangement, the partnerships' down payments constituted equity in the property.

The question then becomes whether the possibility of a default by the buyers may have affected that equity to the extent that it could not truly have been considered equity at all. The contract language actually requiring forfeiture in case of a default reads simply: "[A]ll payments which have been made previously under this Agreement by Buyer, together with the Judgement Note, shall be retained by Seller as liquidated and agreed damages for breach of the Agreement." (Joint Exh. 1–A, ¶ 7(a)(I).) Given the nature of the agreement, its unambiguous language regarding the purchase and sale of the property, and the fact that this provision identifies itself as a liquidated damages clause, the only reasonable conclusion is the clause is what it purports to be. The possibility that buyers might have had to pay liquidated damages in case of a default does

not otherwise affect equity already acquired, equity that in this case was never divested. *Cf. Baird v. Commissioner,* 68 T.C. 115, 1977 WL 3656 (1977) (sale occurred despite fact that $57,000 prepaid interest would be returned if parties failed to consummate final agreement).[9]

RDG's other possible remedy in case of a default by the partnerships was to treat the purchase agreement as a note and mortgage. (*See* Joint Exh. 1–A, ¶ 7(a)(ii).) The seller could then foreclose on the mortgage, sell the property, and apply the proceeds "to the payment of the balance owing," (*id.*), i.e., the difference between the purchase price and the down payment. This remedy, then, specifically considers the $10,000 down payment as equity owned by the partnerships in the property.[10]

■ In sum, the partnerships each had equity in the condominiums in December 1983. The fact that they might later have had to forfeit their down payment as part of predetermined liquidated damages for breach of their obligations does not alter that finding. No state law suggests such a conclusion. In the instant case, all relevant evidence suggests the partnerships acquired and maintained an equity interest from December 1983 forward.[11]

### 4. Present Obligations

■ Plaintiffs argue the purchase agreement vested each of the contracting parties with a present obligation to complete the deal. The government argues there was not a binding obligation on the buyers to pay the entire purchase price as of December 1983.

The government again urges in this context that the buyers had no more than an

---

**9.** There is little doubt that the law considers a buyer to have equity even when the possibility exists that that equity might be divested at a future date, as in the case of forfeiture under an installment land sale contract or foreclosure under a trust deed.

**10.** The deeds in escrow suggest the same conclusion. Had the partnerships not owned any equity interest in the condominiums, there would have been little need to foresee executing a quitclaim deed from the partnerships back to RDG after a potential default.

**11.** The relatively small amount of the partnerships' equity interest works only to mitigate the weight otherwise due this factor. It does not negate the reality of the equity. *See Grodt & McKay Realty,* 77 T.C. at 1237 (inquiry is whether equity exists); *cf. Oesterreich v. Commissioner,* 226 F.2d 798, 803 (9th Cir.1955) ("One who contracts to purchase real property acquires an equity therein immediately on the signing of the contract to purchase and taking possession.").

option to meet their obligations. In *Fletcher v. United States*, 303 F.Supp. 583 (N.D.Ind. 1967), *aff'd*, 436 F.2d 413 (7th Cir.1971) (per curiam), in which the government advanced an identical argument against finding a sale of stock, the court rejected such an approach with precise reasoning:

> [E]ven if the government were correct that seller could not force the buyer to pay the purchase price, it does not follow that the contract was merely an "option." Once it is established, as above, that non-payment by the buyer is a breach of the contract, the only sense in which the agreement is an option is in the same sense that every contract is an option—a promisor has the "option" between performing and not performing. Not performing, however, is unlawful. The fact that one of the parties to a contract has the "option" of pursuing an unlawful course of action does not make the contract an option in the sense for which the government is arguing.

*Id.* at 585.

The *Williams* court distinguished *Fletcher* as involving a seller who retained the right to sue for compensatory damages. *See* 1 F.3d at 507. The distinction does not appear to be especially forceful, at least not under applicable state law precedents in the instant case. Liquidated damages are damages nonetheless,[12] are meant to approximate actual damages,[13] are legal and binding in contracts,[14] are specifically contemplated by the contracting parties,[15] and do not ordinarily change contracts into mere options.[16] Under the government's approach, every contract that contains a liquidated damages clause could become an option contract. By the same reasoning, a party who breaches a contract containing a liquidated damages clause would never be in breach but would only be "exer-

cising an option." While this is an interesting theory, it does not accurately reflect the law of option contracts in Utah. *See supra* part V.B.3 (discussing *Property Assistance Corp. v. Roberts*, 768 P.2d 976 (Utah Ct.App. 1989)).

The purchase agreement speaks in its relevant provisions in terms of obligations. The contract provides that the purchase price owed by the partnerships "shall be payable as follows: (I) Ten Thousand Dollars, ($10,-000), payable in cash or by cashier's check herewith, and (ii) One Million, Six Hundred Fifty-Eight Thousand, Six Hundred Fifty Dollars, ($1,658,650.00), representing the balance of the Purchase Price, shall be evidenced by and payable in accordance with a promissory note." (Joint Exh. 1–A, ¶ 2.) Likewise, the purchase agreement required the seller to execute and deliver a deed to buyers on the settlement date in the absence of a breach by the buyers. (*See* Joint Exh. 1–A, ¶¶ 2, 6); *Williams*, 1 F.3d at 506; *see also infra* part V.B.9 (discussing plaintiffs' rights in equity to compel delivery of title). Thus, both parties to the contract had present obligations in December 1983 when they signed the purchase agreement.

Furthermore, no "side agreement" or similar contract provision existed between seller and buyers as it did in *Williams*, where the parties recited as a condition to completion of the deal that buyers had to obtain financing. *See* 63 T.C.M. (CCH) at 2967. That fact in *Williams* contributed to the Tax Court's resolution of the "present obligations" factor and was not disturbed on appeal. *See id.* No such condition exists in the purchase agreements in the instant case.

In sum, the contract between RDG and the partnerships imposed an obligation on the

---

**12.** The Seventh Circuit in *Williams* had to ignore clear contract language—that $60,000 could be "retained by Seller as liquidated and agreed damages"—to hold that the seller "waiv[ed] any right to seek ... damages." 1 F.3d at 507.

**13.** *See, e.g.*, 5 *Williston on Contracts* § 769, at 636–40 (3d ed. 1961).

**14.** *See, e.g.*, *Warner v. Rasmussen*, 704 P.2d 559, 561 & n. 1 (Utah 1985).

**15.** (*See, e.g.*, Stipulated Facts ¶ 38 (RDG inserted liquidated damages clause in attempt to approximate actual damages under Utah law in event of default).)

**16.** "Where an agreement is made in which there are mutual promises to buy and to sell, it is not turned into an option to buy by the fact that there is also a provision of forfeiture of a down payment as liquidated damages in case of failure to pay further installments." 1A *Corbin on Contracts* § 274, at 608–09 (1963).

partnerships as of December 1983 to pay the first installment. Failure to do so was a breach of contract, not a mere option. Furthermore, seller had deposited its deed in escrow where it was beyond seller's unilateral power to retrieve, thereby obligating seller to deliver the deed in the absence of buyers' default. Finally, no financing condition existed in the instant case as it did in *Williams*, thus distinguishing the outcome of this factor from that determined by the Tax Court under *Williams'* facts. This factor, then, weighs in favor of plaintiffs.

### 5. Right to Possession

 Plaintiffs argue that the purchase agreement vested them with the right to possession in 1983. Defendant argues that there was nothing for them to possess, as the condominiums had not yet been built.

Plaintiffs counter that they had more right to possess the property than any other party. They argue that under Utah law, a condominium is real property that may be bought and sold even before it is built. *See* Utah Code Ann. § 57–8–3(7). They also submit they had the right to possess the commons areas of the condominiums, which were in fact "virtually complete." (Stipulated Facts ¶ 6); *see also* Utah Code Ann. § 57–8–3(7); (Joint Exh. 1–A, ¶ 1). They focus as well on the language of the *Grodt & McKay Realty* factor, which speaks of the *right* to possession, not actual physical possession itself. 77 T.C. at 1237.

The fact that the condominiums were not yet built when the purchase agreements were signed does not work to plaintiffs' detriment. Any reasonable consideration of that fact suggests that, at worst, possession should be a nonfactor. The focus of the factors analysis is on when the relevant benefits and burdens *transferred* from one party to another. In the instant case, defendant argues essentially that the right to possession could not have occurred prior to the time the condominiums were complete. If true, then possession is not a relevant factor, as defendant could not have possessed the condominiums, either, and therefore could not have transferred that right. The posses-

sion issue does factor in, however, and plaintiffs' arguments are persuasive.

The purchase agreement states: "Buyer agrees that, subject to the terms and conditions hereof, Buyer shall enter into possession of the Condominium on and as of the date hereof." (Joint Exh. 1–A, ¶ 6). The purchase agreement does not contain any conditions precedent to that right. Thus, the contract between the seller and buyers vests the right to possession in buyers, not seller, as of December 26, 1983.

Furthermore, the purchase agreement required that the entire condominium be "fully constructed" 400 days from the signing date of the contract (approximately February 1985) and that seller make reasonable efforts to have the condominium "ready for occupancy" by March 15, 1985. (*See* Joint Exh. 1–A, ¶ 4.) Because plaintiffs did not hold RDG in default, they are entitled to the reasonable inference the condominiums were completed by that date. The undisputed evidence therefore puts plaintiffs in actual possession more than six months prior to the settlement date.

The *Williams* case is distinguishable in this respect. In *Williams*, the purchase agreement required that the condominiums be completed by the settlement date or, at the latest, by about one month *after* the settlement date. *See* 1 F.3d at 507. Under those facts, buyers could not have entered into actual physical possession more than six months prior to settlement. The government's arguments on this point in the instant case therefore lack the force they did when presented to the Tax Court and Seventh Circuit.

In sum, the possession arrow points toward plaintiffs.

### 6. Payment of Property Taxes

It is undisputed in the instant case that the partnerships were required to pay the property taxes from the date the purchase agreements were signed in December 1983. The purchase agreement submitted in evidence states:

All real estate taxes with respect to the Condominium will be prorated on and as of

the date hereof, to reflect that all of the benefits and burdens of ownership of the Condominium have been transferred to Buyer as of the date hereof, subject to the terms and conditions hereof. Once the actual real estate tax bill is received, the real estate taxes shall be reprorated based upon the actual amount of tax assessed, and any credits shall be applied as may be required based upon said actual tax assessment.
(Joint Exh. 1–A, ¶ 6; *see also* Pinnacle Partners, Ltd., Private Offering Memorandum, Joint Exh. 9–I, at 40 (partnerships obligated to pay all real property taxes from date of purchase agreements).) Thus, the payment of property taxes as of the date of the purchase agreement fell squarely on buyers.

The amount due or actually paid seems irrelevant, as the *Grodt & McKay Realty* case asks only which party is required to make the payments.[17] As noted, buyers unequivocally carried this burden. Nevertheless, to the extent the amount due is relevant, the instant case is distinguishable from *Williams* on this point. In *Williams,* slightly more than six months elapsed between the signing of the purchase agreement and the settlement date. 1 F.3d at 507. That relatively short time period accounted for the relatively small amount of taxes at stake. *See* 63 T.C.M. (CCH) at 2967. In the instant case, in contrast, two years passed between the signing of the purchase agreement and the settlement date. Consequently, plaintiffs would have been liable for a full two years of taxes before settlement. It was the exclusive duty of the partnerships to pay that amount throughout the entire period, whatever it may have been.

In sum, the tax factor clearly weighs in plaintiffs' favor.

*7. Risk of Loss*

 The *Williams* courts did not address this issue, though it is clearly one of the

factors listed in *Grodt & McKay Realty. See* 77 T.C. at 1238. Plaintiffs argue that the doctrine of equitable conversion placed the risk of loss squarely on the buyers as of the contract date. Defendant argues that as a practical matter the risk of loss remained with the seller: if something had happened to the property or its value prior to the settlement date, plaintiffs would merely have forfeited their $60,000—the $10,000 down payment and the $50,000 judgment note— and walked away, leaving seller to bear the loss.

Plaintiffs have not carried their burden with their equitable conversion argument. While "[t]he earliest origins of equitable conversion have been traced to trust concepts, independent of specific performance,"[18] "[t]he current formulation of the doctrine ... is firmly linked to the specific enforceability of the contract."[19] *See, e.g.,* 3 *American Law of Property,* § 11.22, at 62 (A. James Casner ed., 1952) ("Th[e] doctrine of equitable conversion is applicable only when there is a specifically enforceable contract between the parties...."); *id.* § 11.23, at 64 ("[T]he conversion theory assumes a specifically enforceable contract."); *Butler v. Wilkinson,* 740 P.2d 1244, 1255 (Utah 1987) ("The doctrine gives a vendee the right to obtain a decree of specific performance from a court of equity."); *id.* n. 5 ("The vendee is said to convert the monetary interest that he has in the property to an interest in real estate so that he may invoke the powers of an equity court to compel specific performance of the real estate contract."); *Allred v. Allred,* 15 Utah 2d 396, 393 P.2d 791, 792 (1964) (specific performance available; accordingly, "there appears no good reason why the doctrine of 'equitable conversion' should not be applied"). Whatever the partnerships had, it was not an equitably converted property interest in the sense defined by the American

---

**17.** The actual tax amount owed on any piece of property will always vary depending on the value of the property, the relevant tax rate, and the period of time in question.

**18.** *Cannefax v. Clement,* 786 P.2d 1377, 1386 n. 18 (Utah Ct.App.1990) (Bullock, Senior D.J., dissenting) (citing Davis, *The Origin of the Doctrine*

*of Equitable Conversion by Contract,* 25 Ky.L.J. 58 (1936); Simpson, *Legislative Changes in the Law of Equitable Conversion by Contract,* 44 Yale L.J. 559 n. 3 (1935)), *aff'd,* 818 P.2d 546 (Utah 1991).

**19.** *Id.* (citing *Seton v. Slade,* 7 Ves.Jun. 265 (1802)).

courts—including the Utah Supreme Court— as the purchase agreement limited their remedies to exclude specific performance. (*See* Condominium Purchase Agreement, Joint Exh. 1–A, ¶ 8 (limiting buyers to the "sole and exclusive" remedy of rescission)); *cf. Williams*, 1 F.3d at 506 ("[T]he contract excluded a suit for specific performance by the buyers.").

■ Thus, the risk of loss did not fall on plaintiffs by virtue of the doctrine of equitable conversion. Despite this fact, plaintiffs may still have borne that risk if allocated to them by contract. *See Utah State Medical Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 644 (Utah 1982) (burden of loss specifically allocable by contract). In the instant case, the purchase agreement specifically allocated all burdens of ownership to the partnerships immediately. (*See* Joint Exh. 1–A, ¶ 6.) One such burden is plainly the burden of loss in the event the property was destroyed or declined in value. Accordingly, under the contract, plaintiffs bore the burden of loss from the December 26, 1983, signing date forward.

That finding does not fully answer the United States' argument, however. From the government's perspective, if the property had been destroyed or had dropped in value prior to the settlement date, plaintiffs would merely have declined to make the first installment. Seller would then have suffered the greater loss, regardless what the purchase agreement said.

The government correctly speculates that, under certain circumstances, RDG could have suffered a greater loss than the partnerships. Conversely, however, the partnerships could have suffered the greater loss under a different set of circumstances. The contract, not speculation, defines who bears the risk. The government's position would mean that despite contractual provisions, a seller bears the risk of loss in all land transactions in which liquidated damages are less than the total purchase price. That is not the law.

The parties chose to allocate the burden of loss to the partnerships as outlined in the contract. The liquidated damages clause was meant to approximate the damages RDG would suffer in the event of a default by the partnerships. (*See* Facts ¶ 38.) Thus, the parties anticipated the risk associated with the property and allocated that risk to the partnerships. The Court cannot now say that in doing so the parties left the ultimate risk with the seller.

The partnerships carried insurance on the property from the contract date forward. (*See* Pinnacle Partners, Ltd. Private Offering Mem., Joint Exh. 9–I, at 40 (partnerships obligated to pay all insurance for condominiums as of December 26, 1983).) In addition, the partnerships were subject to loss for taxes paid, profits lost, and loss of possession. No such risk ever transferred back to the seller. Under the circumstances of the instant case, the risk that attached to the partnerships in December 1983 remained with them from that date on.

The Court finds buyers bore the risk of loss on the property from the date they signed the purchase agreements. That risk never shifted from buyers back to seller. This factor, then, counts in plaintiffs' favor.

### 8. Profits

■ The government argues that perhaps the most significant benefit of owning the condominiums would be the profits derived from their sale or operation. Defendant argues the partnerships were restricted by the purchase agreement from transferring their contract rights prior to the settlement date without seller's approval, thereby negating any profits from sale of the property. Defendant also argues the partnerships could not realize rental profits because the units were not complete at the time the purchase agreements were signed.

Plaintiffs take issue with those arguments, suggesting the provision limiting the alienability of their contract rights was most likely unenforceable and, even if it were enforceable, would only be a temporary limitation. Plaintiffs also argue they could have entered into executory contracts for the sale of their rights, thereby receiving immediate profits. Finally, plaintiffs claim they were entitled to all the presettlement appreciation under Utah law.

This factor is similar in one respect to the possession issue. While the condominiums were being built, rental payments could not be realized by anyone. Accordingly, the profits issue based on potential rents would be a nonfactor in the Court's analysis, as neither party could claim this benefit.[20] However, once the condominiums were completed, plaintiffs could have immediately begun to receive rental profits, in this case at a date more than six months before the settlement date.[21] This fact again distinguishes the instant case from *Williams*, where the condominiums were scheduled to be completed *after* the settlement date. *See Williams*, 63 T.C.M. (CCH) at 2967 (trial court); *Williams*, 1 F.3d at 507 (appeals court).

While the partnerships could have received rents prior to December 1985, they could not have sold the condominiums prior to that time without the prior written consent of seller. (*See* Condominium Purchase Agreement, Joint Exh. 1–A, ¶ 9.) The government puts emphasis on this point, arguing that "it is entirely possible" the seller would have demanded a share in the gain in exchange for approval. The fact remains, however—and the government's argument implicitly acknowledges—that the partnerships *could* have sold the condominiums and kept the proceeds, or a substantial portion of them, with seller approval. This was more than the seller could have done. Seller perhaps could have assigned its contractual right to receive payments,[22] but it had already transferred its right to sell the property and realize a resulting profit.

Buyers were the contracting parties who would have benefited from any presettlement appreciation in the property. Such appreciation would have accrued as additional equity in the property on behalf of the partnerships,[23] increasing as well their ability to borrow money using the property as security. *Cf. Williams*, 1 F.3d at 507. RDG would

actually have stood to lose if the value of the condominiums had appreciated prior to the settlement date, as it would have been obligated under the purchase agreements to transfer title at a price below the new market value.

Like the possession issue, the profits issue favors the plaintiffs' position. Buyers had the right to rental profits more than six months prior to the settlement date. In addition, seller had already capitalized on its right to sell the property prior to transferring that right to buyers, limited though it was in form. Finally, buyers were the ones who would have benefited from appreciation in the property. In sum, plaintiffs had the best rights to profits in the condominiums from December 1983 forward.

### 9. Equitable Title

The factors enunciated by the *Grodt & McKay Realty* court, considered by the *Williams* courts, and addressed by the parties in the instant action are "[s]ome of the factors which have been considered by courts" in an attempt to accurately determine the substance of a transaction. *Grodt & McKay Realty*, 77 T.C. at 1237. They do not preclude consideration of other relevant factors based on evidence that may assist the Court as trier of fact in reaching the proper result. Such a factor in the instant case is the question raised by the parties of equitable title, an issue which surfaces, or which lies just below the surface, in nearly every one of the parties' arguments.

The purchase agreement purports to vest buyers with "equitable title" in December 1983. (*See* Joint Exh. 1–A, ¶ 6). The Tax Court in *Williams* held that under Utah law, "Buyers obtained at best some equitable, not legal, interest in the property at the time the Purchase Agreement was executed." 63 T.C.M. (CCH) at 2966 (citing *Bekins Bar V Ranch v. Beryl Baptist Church*, 642 P.2d 371,

---

**20.** *See supra* note 16 and accompanying text (reasoning that a right which cannot be transferred because it does not yet exist should not factor in to the Court's analysis).

**21.** *See supra* part V.B.5 (condominiums completed more than six months prior to settlement date).

**22.** There is no mention in the purchase agreement of a limitation on the seller of that right.

**23.** *See supra* part V.B.3 (discussing partnerships' presettlement equity).

373 (Utah 1982); *Willson v. State Tax Commission,* 28 Utah 2d 197, 499 P.2d 1298, 1300 (1972); *Lach v. Deseret Bank,* 746 P.2d 802, 805 (Utah Ct.App.1987)). The Seventh Circuit held, however, that "[t]here was no vesting of 'equitable title' in any sense, because the contract excluded a suit for specific performance by the buyers." *Williams,* 1 F.3d at 506. In other words, the Seventh Circuit equated "equitable title" with the existence of the equitable remedy of specific performance. Where the remedy was lacking, the court reasoned, the passage of equitable title in any sense was unfulfilled.

It is abundantly clear from the purchase agreement that the parties deliberately excluded the partnerships' remedy of specific performance. Buyers' remedy was limited to the "sole and exclusive remedy" of rescission. (Joint Exh. 1–A, ¶ 8). Plaintiffs' arguments to the contrary cannot undo that clear contract language.[24]

However, it is equally clear that the parties contemplated vesting buyers with "equitable title." (*See* Joint Exh. 1–A, ¶ 6 (captioned "Equitable Title," and expressly vesting buyers with "equitable title")). This act was therefore distinct from equitable title that would arise by operation of law; this was equitable title specifically transferred by contract. In attempting to transfer equitable title while simultaneously excluding the remedy of specific performance to buyers, the contracting parties either made a clear legal error or contemplated some alternative meaning than that considered by the Seventh Circuit.

The latter characterization is the only one that gives meaning to paragraph 6 of the purchase agreement. Any other approach would render the relevant portion of paragraph 6 a nullity. A construction of the term "equitable title" that did not necessarily imply the existence of the specific performance remedy would avoid the otherwise inherent contradiction in the purchase agreement.

There are at least two separate meanings associated with the term "equitable title": 1) "The ownership interest of one who has equitable as contrasted with legal ownership of property as in the case of a trust beneficiary"; and 2) "Ownership rights which are protected in equity." *Black's Law Dictionary* 539, 540 (6th ed. 1990) (definitions of "equitable title" and "equitable ownership"). The government focuses only on the second definition; the contracting parties seem to have intended some form of the first. Under the facts of the instant case, buyers' ownership rights as of December 26, 1983, actually meet both definitions, as follows.

Paragraph 6 of the purchase agreement vests buyers with the right to possession in the property; it transfers all the benefits and burdens of ownership; and it requires buyers to pay all real estate taxes. The Court has found buyers in fact substantially shouldered these rights and responsibilities from the time the contract was signed. *See supra* parts V.B.5–8. Buyers in fact had indicia of ownership "because real and beneficial use and title belong[ed] to [them], even though bare legal title [was] invested in another." *Id.* at 539 (definition of "equitable owner"); *see also Williams,* 63 T.C.M. (CCH) at 2966 (buyers had equitable title), *rev'd on this point,* 1 F.3d at 505–06. The buyers would be able to keep rents from the property prior to the settlement date, even if they were

---

24. Plaintiffs argue, for instance, that the mere inclusion of a liquidated damages clause in a contract does not exclude the remedy of specific performance where otherwise available. *See* 1 *Williston on Contracts,* § 130A, at 446–47 n. 4 (rev. ed., 1965 reprint). Accepting this argument as true, its net effect in the instant case would be to vest *RDG* (the seller) with the specific performance right, as the contract specified liquidated damages only in RDG's favor. (*See* Joint Exh. 1–A, ¶ 7(a)(I).) The right to specific performance in one party to a real estate contract does not necessarily imply that same right in the other when the parties have clearly limited the second party's remedies. Plaintiffs have failed to cite

any authority for the proposition—and reason and common sense will not allow the conclusion—that a contracting party retains a right to specific performance where it has specified the remedy of rescission as its "sole and exclusive remedy." *Cf. Kelley v. Leucadia Financial Corp.,* 846 P.2d 1238, 1242–43 (Utah 1992) (buyers and sellers may limit the remedies of one or both parties; buyer held entitled to specific performance where standard contract gave buyer "any remedy ... under applicable law" and where there was "no evidence ... to suggest that the parties intended to limit [plaintiff's] remedies to preclude specific performance.").

later unable to make the first installment. They would also have to pay taxes regardless whether they later defaulted under the contract. They had possession rights and could use the land to borrow money. In short, they had, substantially, the "benefits and burdens of ownership."

What they did not have was the remedy of specific performance. The question then becomes whether that fact deals a fatal blow to plaintiffs' other rights and responsibilities. The answer under the facts of the instant case has to be no, especially given the nature of the contract. The partnerships in this case had the functional equivalent of a suit for specific performance—in the form of a suit against the escrow agency.

It is within the jurisdiction of equity to compel the delivery of an instrument placed in escrow after the performance of the condition or the occurrence of the event stipulated. If a conveyance is deposited in escrow and the grantor is about to withdraw, or permit the withdrawal of, the instrument before the expiration of the time during which it was to remain on deposit and has conveyed to a purchaser with notice, a court of equity will grant relief, and if necessary, an injunction keeping the title in statu quo and placing the grantee in the same situation that the vendor agreed he should be by giving the right to perform the condition and to receive the deed according to the terms of the contract.

28 Am.Jur.2d *Escrow*, §§ 37, 39, at 50–52 (1966 & Supp.1994); *see also* 1 *Williston on Contracts*, § 212, at 784–85 (3d ed. 1957 & Supp.1992) ("If the escrow holder wrongfully refuses to deliver upon performance of the condition, the injured party's remedy is against him and not the other party, if the latter has not interfered."); Annotation, *Rights and Remedies Where Depositary Fails or Refuses to Deliver Instrument or Property Placed in Escrow, Notwithstanding*

*Performance of Conditions of Delivery,* 95 A.L.R. 293, 294–95 (1935) ("When a depositary fails or refuses to deliver after the performance of the conditions of delivery, it is within the jurisdiction of equity to compel such delivery.") (collecting cases); *cf. Williams,* 1 F.3d at 506 ("If the buyers came up with the ... first installment ..., the escrow agent was required to give them the deed, period.... [T]he entire purpose of an escrow arrangement is to place property beyond the reach of the parties unless stated contingencies materialize." Seller could not have breached contract by refusing to deliver title.); (Stipulated Facts ¶ 12 ("There is no provision whereby a seller of a condominium may obtain documents that were placed in escrow unless there is a default by the buyer.")). Buyers accordingly had ownership rights that were protected in equity.[25]

The parties to the purchase agreements vested equitable title in buyers while at the same time limiting the remedies available to buyers. Utah case law allows parties to contractually limit remedies when specific performance would otherwise be available. *See Kelley v. Leucadia Financial Corp.,* 846 P.2d 1238, 1242–43 (Utah 1992). That simple act will not divest buyers of all other benefits and burdens of ownership when their clear intention was to retain those rights and responsibilities. The substance of the transaction in the instant case indicates the partnerships had and exercised the bulk of those benefits and burdens once they signed the purchase agreements. They were the equitable owners of the property, lacking only legal title, the conveyance of which they could have compelled by a suit in equity if they performed their obligations without defaulting.[26] This fact confirms the earlier findings of the Court and suggests the outcome of the instant dispute.

## VI. Ruling

The resolution of these issues, which the parties themselves have identified as the key

25. There is no case law support, however, for the proposition that a suit of this nature vests the grantees with a right of equitable conversion. *See supra* part V.B.7 (finding partnerships had no equitable conversion rights and citing cases tying equitable conversion to traditional doctrine of specific performance).

26. Whether plaintiffs would have availed themselves of that remedy under all circumstances is a determination that cannot be made under the evidence submitted in the case. The crucial fact is that the remedy was available.

ones, preponderates in favor of plaintiffs. The purchase agreement and other documents, as well as the surrounding circumstances and actions of the contracting parties, show plaintiffs assumed the benefits and burdens of ownership more than six months prior to December 27, 1985.

The benefits and burdens transferred to plaintiffs included the sole right to possess the property; the responsibility to pay taxes on the property; the risk of loss on the property; and the right to profits from and appreciation in the property. Furthermore, plaintiffs had equity in the property from their down payment and had present obligations imposed upon them, the violation of which would result in predetermined liquidated damages under the contract.

Defendant, on the other hand, has shown that bare legal title did not pass to plaintiffs until December 1985. Defendant has further shown the partnerships' equity interest was small and that the seller stood to lose money under certain circumstances if the partnerships defaulted. Finally, defendant has shown plaintiffs could not have sold the condominiums during the presettlement period without seller's permission.

As noted, the legal title issue is irrelevant in the instant analysis. Plaintiffs had contractually defined beneficial ownership and, as noted, concomitant rights and responsibilities. Plaintiffs could also have forced delivery of legal title, in the absence of their own breach, by a suit against the escrow agent. While defendant's other arguments suggest the unique character of the transaction reserved certain traces of indicia of ownership in the seller, the overwhelming weight of the evidence preponderates in favor of the plaintiffs' position.

It is the finding of the Court that the benefits and burdens of ownership in the property passed to plaintiffs more than six months prior to December 27, 1985. It is the further finding of the Court that the sale of the property occurred more than six months prior to December 27, 1985. Accordingly, the December 27, 1985, installment was due more than six months after the date of such sale, and plaintiffs are entitled to the deduc-

tions they claimed pursuant to § 483 of the Code.

### VII. Conclusion

Based on the foregoing, the Court hereby finds for the plaintiffs. All deposits filed with the United States in connection with this litigation shall be returned to plaintiffs forthwith. Judgment for plaintiffs shall be entered pursuant to Rule 58, Federal Rules of Civil Procedure, in accordance with the foregoing Opinion. IT IS SO ORDERED.